## Ex parte ORTIZ.

### (Circuit Court, D. Minnesota, Third Division. May 5, 1900.)

1. **UNITED STATES—POWERS OF NATIONAL GOVERNMENT—CONSTITUTIONAL LIMITATION.**

   The government of the United States can exercise no powers except those delegated to it, either expressly or by necessary implication, by the constitution; hence the civil jurisdiction of the United States can only be exercised within territory over which the constitution is in force and within the limitations imposed by that instrument for the protection of personal and property rights.

2. **SAME—ACQUISITION OF NEW TERRITORY—EXTENSION OF CONSTITUTION OVER PORTO RICO.**

   Upon the cession by Spain to the United States of the Island of Porto Rico, that island became a part of the domain of the United States, and the constitution ex proprio vigore at once extended over it, and became the supreme law of the land, including the provision giving the right of jury trial in criminal prosecutions.

3. **TREATIES—TIME OF TAKING EFFECT—PRIVATE RIGHTS.**

   As affecting private rights, a treaty between two nations becomes effective only from the date when the ratifications by the respective governments are exchanged.

4. **WAR—OCCUPATION OF ENEMY'S TERRITORY—JURISDICTION OF MILITARY COURTS.**

   Petitioner, a resident native of Porto Rico, and a civilian, was tried, convicted, and sentenced in March, 1899, for a crime committed in that island, by a military tribunal of the United States established during the occupancy of the island by the forces of the United States as conquered territory of Spain. Held, that so long as a state of war existed between Spain and the United States, and the island remained Spanish territory, which was until April 11, 1899, when ratifications of the treaty of peace and of

cession were exchanged, such tribunal had jurisdiction to try offenses; and, no objection being made to the formal regularity of the proceedings, that petitioner was not entitled to discharge on a writ of habeas corpus.

This was a proceeding on a writ of habeas corpus issued on petition of Rafael Ortiz and the return thereto.

LOCHREN, District Judge. Upon the amended return of C. McC. Reeve, warden of the Minnesota state prison at Stillwater, to the writ of habeas corpus in this case, hearing was had at the court room in the federal building at St. Paul on the 2d and 3d days of May, 1900, the petitioner being produced in court, and represented by his counsel, J. W. Willis, Esq.; the United States appearing by M. D. Purdy, Esq., Assistant United States Attorney. It appears: That in the war between the United States and Spain, and during the month of July, 1898, the United States forces under the command of Maj. Gen. Miles invaded and took military possession of the Island of Porto Rico, and held such possession until the cession of that island by Spain to the United States by the treaty of Paris, signed December 10, 1898, the ratifications of which were exchanged April 11, 1899. That on October 1, 1898, by order of the president, the military department of Porto Rico was established under the command of Maj. Gen. John R. Brooke, who was succeeded by Gen. Guy V. Henry December 6, 1898, by whose orders a military commission was appointed to meet at San Juan on February 20, 1899, for the trial of such persons as might be brought before it. And on March 27, 1899, the petitioner, Rafael Ortiz, was put upon trial before said military commission upon the charge of murder of John Burke, private of Company C, 47th infantry, on February 24, 1899, and of carrying concealed weapons, and was convicted and sentenced to suffer death, which sentence was, on May 12, 1899, commuted by the president to imprisonment at hard labor for life in the Minnesota state prison at Stillwater, Minn. This brief statement of facts will suffice, as no objection in respect to the formal regularity of the proceedings is made or suggested.

The contention on the part of the petitioner is that at the time of his trial in March, 1899, there was no war in Porto Rico, which had then been ceded to and become a part of the United States; and, as the petitioner had never belonged to the army or navy of the United States, but was a civilian and native resident of Porto Rico, the military commission had no jurisdiction to try him for the alleged murder; and under the provisions of the constitution of the United States he could only be tried by a jury, after indictment or presentment by a grand jury. The contention on the part of the United States is that by the cession the Island of Porto Rico did not become an integral part of the United States, nor subject to the constitution, but merely an outlying province or dependency, to be ruled by the absolute will of congress, untrammeled by any provision of the constitution; and, second, that the war with Spain was not ended, so as to displace the jurisdiction of the military commission, until the exchange of ratifications of the treaty on April 11, 1899, and that then, because the constitution had no force in that island, such jurisdiction

continued until displaced by the provisions of some act of congress. This contention on the part of the government that territory ceded to and brought under the sovereignty of the United States is no part of the United States, and outside of the constitution and its guaranties, is strenuously urged, and an elaborate argument of a law officer of the war department, as well as arguments of several distinguished senators, in support of this contention, have been presented, and carefully considered. The arguments are ingenious, but, in view of the history of the country, and the terms of the constitution, and the very numerous decisions of the supreme court, all to the contrary, I do not find them persuasive. Our general government was founded by the men of the Revolution, who had rebelled against the arbitrary power asserted by Great Britain to govern her outlying colonies at the will of her parliament. They established this government upon the asserted theory that all just powers of government come from the consent of the governed. They founded, as described by President Lincoln in language not yet forgotten, "a government of the people, by the people, for the people." It will be, indeed, marvelous, if it is made to appear that these men who then founded our national government so constructed it that it is capable of ruling with unlimited power a subject people who have neither guaranties to protect them nor any voice in the government. This is foreign absolutism,—the worst form of tyranny. If the constitution does not extend to Porto Rico and our other new acquisitions of territory, but congress has the untrammeled absolute power to establish subject governments, or make laws for such territories, it has the power to establish dependent monarchies or satrapies, state religions, and even slavery. The argument of one of the senators referred to, that the last clause of the thirteenth amendment prevents the establishment there of slavery, is obviously lame and impotent, for, if the constitution does not extend to these parts of the domain of the United States, nor limit congress in its powers of legislation over them, by what process will this single clause of an amendment of that instrument detach itself from the skin of the parchment, and alone fasten itself upon these new territories? If it be considered that this clause of the thirteenth amendment "ex proprio vigore" extends to these new territories, or limits the powers of congress as to these territories, that will concede away the entire contention; for, if that clause extends to the territories, or limits the powers of congress respecting them, every clause of that instrument, for the like reason, is equally potent. To say that a clause in the constitution does not extend to a territory, but does limit the power of congress in legislating for that territory, is to draw a distinction too fine to be practical.

The argument, much repeated, that, if the national government of the United States has not the power to deal with these new territories untrammeled by the constitution, its power is less than that possessed by the other governments of the civilized world, is admitted. It proves nothing. The national government of the United States is one of very limited powers. In respect to its own people, in its entire domain, and generally, except in respect to its power to deal with foreign nations, and concerning matters expressly committed to it

by the constitution, its powers are much less than that possessed by other governments. No one will dispute this. The national government of the United States was created, and its powers and jurisdiction granted and limited, by the federal constitution. Its powers can only be increased by amendment of that instrument. As said by Chief Justice Marshall in Martin v. Hunter's Lessee, 1 Wheat. 326, 4 L. Ed. 102:

"The government, then, of the United States can claim no powers which are not granted to it by the constitution; and the powers actually granted must be such as are expressly given, or given by necessary implication."

And by Mr. Justice McLean, in Briscoe v. Bank, 11 Pet. 317, 9 L. Ed. 733:

"The federal government is one of delegated powers. All powers not delegated to it, or inhibited by it to the states, are reserved to the states, or to the people."

This last is but a paraphrase of the tenth amendment. It is needless to pursue this line of authorities. The reports of the supreme court are full of them; all to the effect that the general government can exercise no power not given by the constitution expressly or by fair implication.

The power of the general government to acquire additional territory rests upon its constitutional power to make war, which may result in conquest; and its like power to make treaties, which may bring territory by cession. The power to govern such acquired territory results from the power to admit new states, and to make all needful rules and regulations respecting the territory or other property belonging to the United States. This clause authorizes congress to legislate in respect to territory in local as well as national matters before its admission to statehood in the Union. As said by Chief Justice Marshall in Insurance Co. v. Canter, 1 Pet. 546, 7 L. Ed. 257:

"In legislating for them, congress exercises the combined powers of the general and of a state government."

This definition of the power of congress in respect to the territories has been often repeated in later decisions, and is exact. It leaves the territory under the protection of the constitution, which grants the power, and which enumerates every power of the general government, and to which the state governments are subordinate.

The novel doctrine that the power to congress to govern territory ceded to the United States may be conferred by a foreign sovereign by and through the terms of the treaty of cession, and that the general government can exercise powers thus granted by a foreign sovereign, independent of and in disregard of the constitution, until congress, mayhap, in the future, shall, by its enactment, see fit to extend the constitution over the territory, is contrary to the holding of the supreme court of the United States above cited, to the effect that the general government is one of enumerated powers, and can claim and exercise no power not granted to it by the constitution, either expressly or by necessary implication. It is clear that the general government cannot legislate over territory where the constitution from which its every power is derived does not extend. The constitu-

tion must be in force over a territory before the general government can have any authority to legislate respecting it. No foreign sovereign can invest the general government with any legislative power. Plain as this proposition appears, it happens to be directly supported by decision of the supreme court. In Pollard's Lessees v. Hagan, 3 How. 225, 11 L. Ed. 572, the court says:

"It cannot be admitted that the king of Spain could, by treaty or otherwise, impart to the United States any of his royal prerogatives; and much less can it be admitted that they have capacity to receive, or power to exercise, them. Every nation acquiring territory by treaty or otherwise must hold it subject to the constitution and laws of its own government, and not according to those of the government ceding it."

In License Cases, 5 How. 613, 12 L. Ed. 305, Mr. Justice Daniel says:

"Laws of the United States, in order to be binding, must be within the legitimate powers vested by the constitution. Treaties, to be valid, must be made within the scope of the same powers; for there can be no 'authority of the United States' save what is derived mediately or immediately and regularly and legitimately from the constitution."

It has been also held by the supreme court in many cases that the stipulations of a treaty have no more force than an act of congress, and may be abrogated or repealed by an act of congress at any time. Head Money Cases, 112 U. S. 580, 5 Sup. Ct. 247, 28 L. Ed. 798; Whitney v. Robertson, 124 U. S. 190, 8 Sup. Ct. 456, 31 L. Ed. 386; Chinese Exclusion Case, 130 U. S. 581, 9 Sup. Ct. 623, 32 L. Ed. 1068. From the opinion of the court by Mr. Justice Field in the case last cited I quote:

"The power of exclusion of foreigners being an incident of sovereignty belonging to the government of the United States as a part of those sovereign powers delegated by the constitution, the right to its exercise at any time when, in the judgment of the government, the interests of the country require it, cannot be granted away or restrained on behalf of any one. The powers of government are delegated in trust to the United States, and are incapable of transfer to any other parties. They cannot be abandoned or surrendered, nor can their exercise be hampered, when needed for the public good, by any consideration of private interest. The exercise of these public trusts is not the subject of barter or contract."

If an incident of sovereignty, "part of those sovereign powers delegated by the constitution," cannot be restrained by treaty stipulation, and "is not the subject of barter or contract," it seems to me that the claim that whether the entire constitution does or does not extend to territory within the dominion and sovereignty of the United States depends upon the stipulations of a treaty with some foreign power can deserve no serious consideration.

The subject of the status of newly-acquired territory was very fully considered in the Dred Scott Case, 19 How. 393, 15 L. Ed. 691. In the opinion of the chief justice (page 446 et seq., 19 How., and page 718, 15 L. Ed.) it is said:

"There is certainly no power given by the constitution to the federal government to establish or maintain colonies bordering on the United States or at a distance, to be ruled and governed at its own pleasure. * *. * The power to expand the territory of the United States by the admission of new states is plainly given; and, in the construction of this power by all the departments of

the government, it has been held to authorize the acquisition of territory not fit for admission at the time, but to be admitted as soon as its population and situation would entitle it to be admitted. It is acquired to become a state, and not to be held as a colony, and governed by congress with absolute authority. * * * A power, therefore, in the general government to obtain and hold colonies and dependent territories, over which they might legislate without restriction, would be inconsistent with its own existence in its present form. * * * It cannot create for itself a new character, separate from the citizens of the United States, and the duties it owes them under the constitution. The territory being a part of the United States, the government and the citizen both enter it under the constitution, with their respective rights defined and marked out; and the federal government can exercise no power over his person or property beyond what that instrument confers, nor lawfully deny any right which it has reserved. A reference to a few of the provisions of the constitution will illustrate the proposition. For example, no one, we presume, will contend that congress can make any law in a territory respecting the establishment of religion, or the free exercise thereof, or abridging the freedom of speech or of the press, or the right of the people of the territory peaceably to assemble and to petition the government for the redress of grievances; nor can congress deny to the people the right to keep and bear arms, nor the right to trial by jury. * * * It could confer no power on any local government established by its authority to violate the provisions of the constitution."

While the decision in that case relative to the status of the negro race has been the subject of much criticism, no one has ever questioned that part of the decision which relates to the status of acquired territory. Each one of the nine justices wrote a separate opinion, without disagreement as to the powers of the general government over such territory. Mr. Justice Curtis, who dissented from the majority as to the status of the negro, fully concurred upon the subject now under consideration, and expressed his views in his usual apt and plain language. He says, at page 612 et seq., 19 How., and page 786 et seq., 15 L. Ed.:

"But it is also insisted that provisions of the constitution respecting territory belonging to the United States do not apply to territory acquired by treaty from a foreign nation. This objection must rest upon the position that the constitution did not authorize the federal government to acquire foreign territory, and consequently has made no provisions for its government when acquired, or that, though the acquisition of foreign territory was contemplated by the constitution, its provisions concerning the admission of new states, and the making of all needful rules and regulations respecting territory belonging to the United States, were not designed to be applicable to territory acquired from foreign nations. It is undoubtedly true that, at the date of the treaty of 1803 between the United States and France for the cession of Louisiana, it was made a question whether the constitution had conferred on the executive department of the United States power to acquire foreign territory by treaty. There is evidence that very grave doubts were then entertained concerning the existence of this power. But that there was then a settled opinion in the executive and legislative branches of the government that this power did not exist cannot be admitted without at the same time imputing to those who negotiated and ratified the treaty, and passed the laws necessary to carry it into execution, a deliberate and known violation of their oaths to support the constitution; and, whatever doubts may then have existed, the question must now be taken to have been settled. Four distinct acquisitions of foreign territory have been made in as many different administrations. Six states formed of such territory are now in the Union. Every branch of this government, during a period of fifty years, has participated in these transactions. To question their validity is now in vain. As said by Mr. Chief Justice Marshall in Insurance Co. v. Canter, 1 Pet. 542, 7 L. Ed. 255: 'The constitution confers absolutely on the government of the Union the

powers of making war and of making treaties. Consequently that government possesses the power of acquiring territory, either by conquest or treaty. See Sere v. Pitot, 6 Cranch, 336, 3 L. Ed. 240.' And, I add, it also possesses the power of governing it, when acquired, not by resorting to supposititious powers nowhere found described in the constitution, but expressly granted in the authority to make all needful rules and regulations respecting the territory of the United States. * * * I construe this clause, therefore, as if it had read, Congress shall have power to make all needful rules and regulations respecting those tracts of country, out of the limits of the United States, which the United States have acquired, or may hereafter acquire, by cessions, as well of jurisdiction as of the soil, so far as the soil may be the property of the party making the cession, at the time of making it. * * * If, then, this clause does contain a power to legislate respecting the territory, what are the limits of that power? To this I answer that, in common with all the other legislative powers of congress, it finds limits in the express prohibitions on congress not to do certain things; that, in the exercise of the legislative power, congress cannot pass an ex post facto law or bill of attainder; and so in respect to each of the other prohibitions contained in the constitution."

In First Nat. Bank v. Yankton Co., 101 U. S. 129, 133, 25 L. Ed. 1046, 1047, Chief Justice Waite says:

"All territory within the jurisdiction of the United States not included in any state must necessarily be governed by, or under the authority of, congress. The territories are but political subdivisions of the outlying dominion of the United States. * * * Congress is supreme, and, for the purposes of this department of its governmental authority, has all the powers of the people of the United States, except such as have been expressly or by implication reserved in the prohibitions of the constitution. * * * It may do for the territories what the people, under the constitution, may do for the states."

The fact that the third article of the constitution, providing for the federal judiciary, has been held not applicable to the local judiciary of a territory, is sometimes gravely urged as supporting the idea that the constitution does not cover the territories. It does not deserve serious notice. As has been often decided, congress exercises in respect to a territory all the powers of the general government, and also all the powers which a state government may exercise in a state. The federal judiciary has a very limited jurisdiction, and a local judiciary is therefore as necessary in a territory as in a state, and may be provided for by congress under its power of local government, just as a state may establish its local judiciary. So with reference to any other constitutional provisions applicable only to the federal government, and not to state governments; they may not apply to the local governments of territories, and this could constitute no argument that the territories, more than the states, are outside the constitution. The plain, obvious, and undeniable fact is that the general government of the United States, created by the constitution, and possessing no vitality or power not directly drawn from that instrument, can only exist and legislate where that constitution is in force, and that every tract of territory that comes under the sovereignty of the United States comes necessarily under that constitution which alone gives life to that sovereignty, and beyond which that sovereignty must cease. That the words "United States," as a general description of the country subject to the general government created by the constitution, include, not only the states of the Union, but the District of Columbia and all the terri-

100 F.—61

tories, and consequently extend to all places over which the general government extends, and that the constitution is equally extensive, was held in 1820 by Chief Justice Marshall, in Loughborough v. Blake, 5 Wheat. 317, 319, 5 L. Ed. 98; and the doctrine has never since been questioned by any court.

Further discussion or citation of authorities upon this branch of the case seems to me to be needless. It must be held that, upon the cession by Spain to the United States of the Island of Porto Rico, that island became a part of the dominion of the United States,— as much so as is Arizona or Minnesota,—and that the constitution of the United States, ex proprio vigore, at once extended over that island, and that this extension of the constitution gave to congress, whose every power must come from that instrument, the authority to legislate in respect to that island as a part of the United States territory.. It follows that all the provisions of the constitution in respect to personal and property rights, including the right to trial by jury in criminal prosecutions, became at once, when the cession was completed, a part of the supreme law of the land. The character of an offense and the measure of its punishment would be determined by the law in force when and where the act was committed, and laws of that character remain in force after the cession until changed; but the manner of the trial must depend on the law in force when the trial is had, even though the establishment and organization of courts must be awaited before the trial can be had.

For many months prior to the treaty of peace with Spain, as before stated, the military forces of the United States held and occupied the Island of Porto Rico by force of arms, as conquered territory, forming a military department, governed by military law, administered through military tribunals, according to the usages of war and the orders in force. It devolved upon the military commander the power to govern the inhabitants and to punish their crimes. But such occupation and jurisdiction were temporary, and ended with the restoration of peace and the cession of the island to the United States; making it a part of the domain of that country, and, under its constitution, subject to all the powers of the general government. Then, the war being ended, the jurisdiction of military tribunals over civilians would cease. Ex parte Milligan, 4 Wall. 2, 18 L. Ed. 281. The petitioner, Rafael Ortiz, was a civilian, a native of the Island of Porto Rico, and had never been in the land or naval service of the United States. While the state of war existed he might lawfully be tried by a military commission for offenses committed; but not after peace was established, and that country became a part of the United States. It is therefore important to determine the date when the war in fact ended, and the treaty of peace and of cession went into effect. A treaty is a written contract between sovereigns. Its terms are agreed upon, and it is signed by plenipotentiaries or commissioners, who are the authorized agents of the contracting powers. But after such agreement and signature it must be ratified by the governments, and the exchange of ratifications constitutes the delivery. Up to that time it is inchoate, and may never take effect.

As between the contracting sovereigns, the treaty, when ratified, relates back to the time of signing, as the stipulations then made had reference to then existing conditions. U. S. v. Arredondo, 6 Pet. 691, 757, 8 L. Ed. 547. But in respect to private rights the rule is different, and, as affecting them, the treaty does not take effect until the exchange of ratifications. Haver v. Yaker, 9 Wall. 32, 19 L. Ed. 571. Long time may elapse between the signing of a treaty and the exchange of ratifications. In the case last cited five years had elapsed. In the meantime affairs go on irrespective of the terms of the treaty, and will not be disturbed by any application of the doctrine of relation. It follows that, when the petitioner was tried by the military tribunal, the state of war still in fact existed in Porto Rico, and that tribunal had jurisdiction to try, convict, and sentence him for said alleged offense. The petitioner's application must therefore be denied, and he is remanded to the custody of the warden of the state prison. In view of this conclusion, it might seem unnecessary to examine, even as briefly as I have, the claim that the constitution does not apply to newly-acquired domain of the United States, had that claim not been urged, with such confidence and amplitude of argument, as the basis on which the decision of the case must rest, that acquiescence might be inferred from silence.