## UNITED STATES *v.* PELICAN.

ERROR TO THE DISTRICT COURT OF THE UNITED STATES FOR
THE EASTERN DISTRICT OF WASHINGTON.

No. 787.   Argued January 13, 1914.—Decided February 24, 1914.

The Colville Reservation in the State of Washington was set apart by
    Executive order in July, 1872, has been repeatedly recognized by
    acts of Congress and is a legally constituted reservation, and, as
    such, is included in Indian country to which § 2145, Rev. Stat.,
    refers.

A legally constituted Indian reservation is none the less embraced
    within the Indian country referred to in § 2145, Rev. Stat., because
    it may have been segregated from the public domain.

The authority of Congress to deal with crimes committed on or against
    Indians upon the lands within an Indian Reservation is not affected

by the admission of the Territory, within which it is included, as a State into the Union.

Lands allotted in severalty to the Indians on the Colville Reservation under the acts of July 1, 1892, and July 1, 1898, when the rest of the reservation was thrown open to settlement were held in trust by the United States for the allottees under the jurisdiction and control of Congress for all governmental purposes relating to the guardianship and protection of the Indians.

Congress has power to punish crimes committed by or against Indians upon allotted lands, and the allotments in severalty are embraced in the term Indian country as used in § 2145, Rev. Stat., and the allotments of the Colville Reservation have not been excluded therefrom by the statutes providing for the allotments.

Territorial jurisdiction of the United States does not depend upon the size of the particular areas held for Federal purposes. Criminal Code, § 272.

The retention by the United States of jurisdiction over Indian allotments is based on the fundamental consideration of the protection of a dependent people. *United States* v. *Rickert,* 188 U. S. 432.

Part of the National policy in regard to Indians is that the United States shall retain control over the allotments in severalty for the statutory period during which the Indians are to be maintained as well as prepared for assuming habits of civilized life and ultimately the privileges of citizenship.

Congress has power under the Constitution to continue the guardianship of the Government over Indians for the period specified in the statutes for keeping the title of the allotments in the United States.

Even if one committing a crime on an Indian allotment is not an Indian, if the crime was committed against an allottee Indian within the trust period, it is punishable under the laws of the United States and the Federal court has jurisdiction.

THE facts, which involve the jurisdiction of the District Court of the United States over crimes committed within Indian country, are stated in the opinion.

*Mr. Assistant Attorney General Wallace* for the United States.

There was no appearance or brief filed for defendant in error.

MR. JUSTICE HUGHES delivered the opinion of the court.

The defendants were indicted for the murder, on August 30, 1913, of Ed Louie, a full-blood Indian and a member of the Colville tribe. It was charged that the crime was committed "at a point about nine miles northwest of the town of Curlew, in the county of Ferry, State of Washington, in the Indian country, to wit, upon the allotment of one Agnes, an Indian, being lot three of section twenty-six, and lot nine of section thirty-five, in township forty north, of range thirty-two, E. W. M., in the Northern Division of the Eastern District of Washington, said land being then held in trust by the United States for the said Agnes for the period of twenty-five years from the date of the trust patent to wit, from the 6th day of December, A. D., 1909."

The indictment was based upon § 2145 of the Revised Statutes which provides that, save as stated, "the general laws of the United States as to the punishment of crimes committed in any place within the sole and exclusive jurisdiction of the United States, except the District of Columbia, shall extend to the Indian country" (see Rev. Stat., § 5339; Criminal Code, 35 Stat. 1088, c. 321, §§ 272, 273, 341).

A demurrer was filed upon the ground that it did not appear that the crime had been committed within "the Indian country" and hence that the court was without jurisdiction. In connection with the hearing upon the demurrer the parties stipulated that the land described in the indictment as the place of the crime had been allotted to the Indian Agnes under the act approved February 8, 1887, and the act in amendment and extension thereof approved February 28, 1891, and that this land was situated on that part of the Colville Indian Reservation which had been opened to settlement and entry by

the act of Congress. (See act of July 1, 1892, c. 140, 27 Stat. 62.) The District Court, holding that the Agnes allotment was not a part of the Indian country within the meaning of the statute, sustained the demurrer; and the Government brings this writ of error under the Criminal Appeals Act, March 2, 1907, c. 2564, 34 Stat. 1246.

There can be no doubt that the Colville Reservation, set apart by executive order on July 2, 1872 (Exec. Ord. Ind. Reserv. (ed. 1912), 194, 195; 1 Kappler, 915, 916) and repeatedly recognized by acts of Congress,[1] was a legally constituted reservation. *In re Wilson,* 140 U. S. 575, 577. As such it was included in the "Indian country" to which § 2145 of the Revised Statutes refers, and it was none the less embraced within that description because it had been segregated from the public domain. *Donnelly* v. *United States,* 228 U. S. 243, 269. The inquiry, then, is whether, with respect to the part of the original reservation that is comprised in the described allotment, the United States has lost the jurisdiction which it formerly had. The authority of Congress to deal with crimes committed by or against Indians upon the lands within the reservation was not affected by the admission of the State of Washington into the Union (act of February 22, 1889, c. 180, 25 Stat. 676, 677; *Draper* v. *United States,* 164 U. S. 240, 242, 247; *Donnelly* v. *United States,* 228 U. S. 243, 271, 272); and we pass to the consideration of the effect of the Federal legislation by which the reservation was diminished.

By the act of July 1, 1892, c. 140, 27 Stat. 62, a specified tract or portion of the reservation—with certain exceptions—was "vacated and restored to the public domain"

---

[1] July 4, 1884, c. 180, 23 Stat. 76, 79; February 8, 1887, c. 119, 24 Stat. 388; February 28, 1891, c. 383, 26 Stat. 794; July 1, 1892, c. 140, 27 Stat. 62; February 20, 1896, c. 24, 29 Stat. 9; March 6, 1896, c. 42, 29 Stat. 44; June 18, 1898, c. 465, 30 Stat. 475; July 1, 1898, c. 545, 30 Stat. 571, 593; March 22, 1906, c. 1126, 34 Stat. 80.

and it was provided that this tract should be open to
settlement and entry by the proclamation of the President
and should be disposed of under the general laws ap-
plicable to the disposition of public lands in the State of
Washington. The exceptions were made by Congress in
order to care for the Indians residing on that portion of
the reservation. Every such Indian was entitled to select
therefrom eighty acres which was to be alloted to the
Indian in severalty (§ 4). The titles to the lands selected
were to "be held in trust for the benefit of the allottees,
respectively, and afterwards conveyed in fee simple to
the allottees or their heirs" as provided in the acts of
February 8, 1887, c. 119, 24 Stat. 388, and February 28,
1891, c. 38, 26 Stat. 794. Further, certain school and mill
lands within the described tract were reserved from the
operation of the statute, unless other lands were selected
in their stead (§ 6).

The evident purpose of Congress was to carve out of the
portion of the reservation restored to the public domain
the lands to be allotted and reserved, as stated, and to
make the restoration effective only as to the residue. The
vacation and restoration which the statute accomplished
(§ 1) was thus expressly made "subject to the reservations
and allotment of lands in severalty to the individual
members of the Indians of the Colville Reservation" for
which the act provided. In 1898, in furtherance of the
same object, Congress required the completion of the
allotments as soon as practicable and not later than six
months after the President's proclamation (act of July 1,
1898, c. 545, 30 Stat. 571, 593). Accordingly, the Presi-
dent issued his proclamation on April 10, 1900, declaring
that the restored portion of the reservation would be
open to settlement and entry on October 10, 1900, and
an appropriate clause was inserted which saved and ex-
cepted such tracts as had been or might be "allotted to
or reserved or selected for the Indians, or other purposes,"

under the governing statutes. 31 Stat. 1963, 1965. The Government presents extracts from the records of the Department of the Interior which purport to show that the actual allotment to the Indian Agnes, of the land described in the indictment, had been made prior to the date of this proclamation, and we are asked to take notice of that fact. We find it to be unnecessary to pass upon this, but we shall assume in view of the grounds of the decision below that the allotment was duly made under the statutory provisions to which we have referred, and it follows that these allotted lands must be deemed to be among those excepted from the portion of the reservation which was thrown open to settlement.

Although the lands were allotted in severalty, they were to be held in trust by the United States for twenty-five years for the sole use and benefit of the allottee, or his heirs, and during this period were to be inalienable. That the lands, being so held, continued to be under the jurisdiction and control of Congress for all governmental purposes, relating to the guardianship and protection of the Indians, is not open to controversy. *United States* v. *Rickert*, 188 U. S. 432, 437; *McKay* v. *Kalyton*, 204 U. S. 458, 466, 468; *Couture* v. *United States*, 207 U. S. 581; *United States* v. *Celestine*, 215 U. S. 278, 290, 291; *United States* v. *Sutton*, 215 U. S. 291; *Tiger* v. *Western Investment Co.*, 221 U. S. 286, 315, 316; *Hallowell* v. *United States*, 221 U. S. 317; *United States* v. *Wright*, 229 U. S. 226, 237. Thus, in the act of January 30, 1897, c. 109, 29 Stat. 506, relating to the introduction of intoxicating liquor "into the Indian country," it is expressly provided that this term "shall include any Indian allotment while the title to the same shall be held in trust by the Government, or while the same shall remain inalienable by the allottee without the consent of the United States." This statute was upheld in *United States* v. *Sutton, supra*, as a valid exercise of Federal power with respect to allotments made under the

act of February 8, 1887, within the Yakima Reservation
in the State of Washington. Again, in *Hallowell* v. *United
States, supra,* the Federal jurisdiction under the same
statute was sustained with respect to an allotment to an
Omaha Indian in Nebraska, the title being held in trust by
the Government under the act of August 7, 1882, c. 434,
22 Stat. 341. There, it appeared that practically all the
lands in the Omaha Reservation had been allotted and
that many of the allotments of deceased Indians had
passed into the hands of the whites, without restrictions,
under the provisions of the act of May 27, 1902, c. 888, 32
Stat. 245, 275. Further, the Omaha Indians were exer-
cising the rights of citizenship within the State and the
defendant himself, who was charged with taking liquor
to his own allotment, was a citizen and had served as a
public officer. The question certified to this court was,
in effect, whether the fact that the allotment was held by
the Government in trust authorized Congress to regulate
or prohibit the introduction of liquor. This question was
answered in the affirmative, the court saying (221 U. S.
p. 324): "In the case at bar, the United States had not
parted with the title to the lands, but still held them in
trust for the Indians. In that situation its power to make
rules and regulations respecting such territory was
ample. . . . While for many purposes the jurisdic-
tion of the State of Nebraska had attached, and the
Indian as a citizen was entitled to the rights, privileges,
and immunities of citizenship, still the United States
within its own territory and in the interest of the Indians,
had jurisdiction to pass laws protecting such Indians from
the evil results of intoxicating liquors as was done in the
act of January 30, 1897, which made it an offense to in-
troduce intoxicating liquors into such Indian country,
including an Indian allotment." It cannot be doubted
that the power of Congress was quite as complete to
punish crimes committed by or against Indians upon

allotted lands of this character as to prohibit the introduction of liquor. The present question then is not one of power, but whether it can be said that the descriptive term "Indian country" as it is used in § 2145 of the Revised Statutes is inadequate to embrace these allotments, or, if it is adequate for that purpose, whether Congress in providing for the allotments has excluded them from the purview of that statute.

We find no inadequacy in the statutory description. The lands, which prior to the allotment undoubtedly formed part of the Indian country, still retain during the trust period a distinctively Indian character, being devoted to Indian occupancy under the limitations imposed by Federal legislation. The explicit provision in the act of 1897, as to allotments, we do not regard as pointing a distinction but rather as emphasizing the intent of Congress in carrying out its policy with respect to allotments in severalty where these have been accompanied with restrictions upon alienation or provision for trusteeship on the part of the Government. In the present case, the original reservation was Indian country simply because it had been validly set apart for the use of the Indians as such, under the superintendence of the Government. *Donnelly* v. *United States, supra.* The same considerations, in substance, apply to the allotted lands which, when the reservation was diminished, were excepted from the portion restored to the public domain. The allottees were permitted to enjoy a more secure tenure and provision was made for their ultimate ownership without restrictions. But, meanwhile, the lands remained Indian lands set apart for Indians under governmental care; and we are unable to find ground for the conclusion that they became other than Indian country through the distribution into separate holdings, the Government retaining control.

It is said that it is not to be supposed that Congress has intended to maintain the Federal jurisdiction over hun-

dreds of allotments scattered through territory other portions of which were open to white settlement. But Congress expressly so provided with respect to offenses committed in violation of the act of 1897. Nor does the territorial jurisdiction of the United States depend upon the size of the particular areas which are held for Federal purposes (Criminal Code, § 272). It must be remembered that the fundamental consideration is the protection of a dependent people. As the court said in *United States* v. *Rickert*, 188 U. S. 432, 437, where allotments had been made under the conditions provided by the act of February 8, 1887 (and it was found that the agreement with the Indians, 26 Stat. 1035–1038, did not indicate any different relation of the United States to the allotted lands from that created or recognized by that act): "These Indians are yet wards of the Nation, in a condition of pupilage or dependency, and have not been discharged from that condition. They occupy these lands with the consent and authority of the United States; and the holding of them by the United States under the act of 1887, and the agreement of 1889, ratified by the act of 1891, is part of the national policy by which the Indians are to be maintained as well as prepared for assuming the habits of civilized life, and ultimately the privileges of citizenship." It is true that by section six of the act of 1887, 24 Stat. p. 390, it was provided that upon the completion of the allotments and the patenting of the lands to the allottees under that act every allottee should "have the benefit of and be subject to the laws, both civil and criminal, of the State or Territory" in which he resided. See *Matter of Heff,* 197 U. S. 488. But, by the act of May 8, 1906, c. 2348, 34 Stat. 182, Congress amended this section so as distinctly to postpone to the expiration of the trust period the subjection of allottees under that act to state laws. The first part of the section as amended is: "That at the expiration of the trust period and when the

lands have been conveyed to the Indians by patent in fee, as provided in section five of this act, then each and every allottee 'shall have the benefit of and be subject to the laws, both civil and criminal, of the State or Territory in which they may reside." And, at the same time, there was added to the section the explicit proviso: "That until the issuance of fee-simple patents all allottees to whom trust patents shall hereafter be issued shall be subject to the exclusive jurisdiction of the United States." We deem it to be clear that Congress had the power thus to continue the guardianship of the Government. (*United States* v. *Kagama*, 118 U. S. 375, 383, 384; *United States* v. *Celestine, supra; Tiger* v. *Western Investment Company, supra; Hallowell* v. *United States, supra; Heckman* v. *United States*, 224 U. S. 413, 437; *Ex parte Webb*, 225 U. S. 663, 683; *United States* v. *Wright, supra; United States* v. *Sandoval*, 231 U. S. 28, 46; *Perrin* v. *United States*, decided this day, *post*, p. 478); and these provisions leave no room for doubt as to the intent of Congress with respect to the maintenance of the Federal jurisdiction over the allotted lands described in the indictment.

A cognate question is presented as to the status of the person with whose murder the defendants are charged. It is not alleged in the indictment that the defendants were Indians and we assume that they were not. But the court below had jurisdiction if the deceased was an Indian ward. *Donnelly* v. *United States, supra,* pp. 269–272. It is alleged, as already stated, that the deceased was "a full-blood Indian, a member of the Colville tribe," and, further, that he had received an allotment of land under the act of 1887, as amended in 1891, and under the act of July 1, 1892, the land being held in trust by the United States for twenty-five years from the date of the patent, July 31, 1900. Upon this statement, the deceased must be regarded as one who was still under the Government's care. Congress had not terminated that relation, and the com-

mission of a crime against his person upon Indian lands, such as we have found the allotted lands in question to be, was punishable under the laws of the United States.

The order sustaining the demurrer is reversed and the cause is remanded to the District Court for further proceedings in conformity with this opinion.

*It is so ordered.*