THE STATE OF NEVADA, RESPONDENT, *v.* PETE MENDEZ, APPELLANT

No. 3151

October 2, 1936.                    16 P. (2d) 300.

*Harlan L. Heward* and *A. R. Schindler*, for Appellant:

*Gray Mashburn,* Attorney-General; *W. T. Mathews* and *W. Howard Gray,* Deputy Attorneys - General; *Ernest S. Brown,* District Attorney; and *Nash P. Morgan,* Deputy District Attorney, for the State:

## OPINION

By the Court, DUCKER, C. J.:

The appellant was convicted of the crime of murder of the second degree and has appealed from the judgment and order denying his motion for a new trial.

He has assigned a number of errors. We will not discuss them in the order presented in the opening brief.

The appellant was charged with stabbing one Nellie Sam with a knife on the 7th day of December 1935, inflicting wounds upon her from which she died on the following day. Nellie Sam was a Pah Ute Indian woman, and the accused was living with her at the time of the homicide in the town of Wadsworth, county of Washoe, Nevada, where the killing occurred. About dusk on the former day two Indian boys were attracted to the spot where the stabbing occurred by the cursing of the accused and the outcry of the woman. They saw Nellie Sam lying on the ground. She had been stabbed in the back. The witnesses saw a large quantity of blood on the ground and blood on the prostrate woman. The mother of the injured woman arrived on the scene shortly after the appearance of the former witnesses and asked her if Pete (appellant) had done that. The daughter said "Yes." To the deputy constable, who had been summoned to the place, the appellant said: "Well, she made me do it." Appellant was taken into custody by the officer, and, when he was unlocking the door of the jail, appellant fled, but was captured before he had

gone far. A knife was found on the day following the stabbing about 75 feet from the pool of blood. Nellie Sam's mother testified that she saw the knife in the appellant's house a long time before December 7, 1935.

No point was made that the evidence is insufficient to support the verdict and judgment.

One of appellant's principal objections is that the court was without jurisdiction to try him because, as is contended, the evidence shows that he was an Indian, the deceased was an Indian, and the killing occurred on an Indian reservation. The contention is based on the proviso of section 9954 N. C. L. The section reads: "All the laws of this state concerning crimes and punishments, or applicable thereto, are extended to and over all Indians in this state, whether such Indians be on or off an Indian reservation, and all of said laws are hereby declared to be applicable to all crimes committed by Indians within this state, whether committed on or off an Indian reservation, save and except an offense committed upon an Indian reservation by one Indian against the person or property of another Indian."

It is conceded by counsel for the state that the woman slain was a Pah Ute Indian. They contend, however, that the accused is a Mexican, or, if an Indian in the sense that his ancestors belonged to one of the tribes that inhabited North America upon its discovery, he is not an Indian maintaining tribal relations. Indians maintaining such relations, counsel insist, are meant in the proviso of the section. On the other hand counsel for appellant contend, members of the race inhabiting North America on the coming of the white man are meant irrespective of tribal relations. It appears from the evidence that appellant has a Mexican name, had lived in Mexico, had relations in Mexico, and was generally thought by the people among whom he lived to be a Mexican because he talked that language. The sheriff and deputy sheriff to whose custody appellant was remanded after the killing testified that he told

them he was a Mexican. Appellant at his trial denied making such statements. He testified that he was a Pueblo Indian and spoke Indian; that his mother and father were Pueblo Indians; and that he never told any one he was a Mexican.

On the part of the defense, Dr. Harry E. Wheeler, a member of the faculty of the University of Nevada, testified that he had examined the appellant on three different occasions and had made an investigation of his type and blood. He gave his opinion that appellant was an Indian. Preliminarily he testified at length as to his educational qualifications derived from extended courses in several universities on the subjects of paleontology, ethnology, and anthropology, and from independent research, which entitled him to give such an opinion. He specified twenty characteristics which prevailed in members of the Indian race as the basis of his opinion.

■■ We are of the opinion that there is no substantial evidence in the record that would have warranted the jury in finding against appellant on this phase of the case. His testimony that he is an Indian and the testimony and opinion of the witness Wheeler that he is an Indian were not shaken on cross-examination. The circumstances that he had lived in Mexico, had relatives in Mexico, bore a Mexican name, and was thought by those among whom he lived to be a Mexican, are entitled to no weight against the positive testimony that he is an Indian. In fact, it is common knowledge that many Indians in and about Mexico bear Mexican names, and many inhabitants and natives of Mexico are of the Indian race. Webster's New International Dictionary (2d ed.) Unabridged, defines the noun, "Mexican," as follows: "A native or inhabitant of Mexico. The Mexicans comprise a dominant white population of Spanish descent, Mestizos, and Indian tribes ranging in culture from the primitive Seris to the civilized Mayas." Conceding, which appellant denied,

that he told the two officers that he was a Mexican, such a statement would not be inconsistent with his being an Indian. An American negro could truly state that he was an American, but the fact would still remain that he was a member of the negro race. The officers both stated that they questioned him as to his nationality. The question is not as to nationality, but as to race.

Counsel for the state are not satisfied that appellant is not an Indian, for they say in their brief: "In the sense that an Indian is one whose ancestors inhabited North America at the time of its discovery, perhaps the defendant is an Indian."

■ Their contention that the legislature in enacting the proviso in said section had in mind only Indians sustaining tribal relations is likewise untenable. The same contention made in the case of Frazee v. Spokane County, 29 Wash. 278, 69 P. 779, 782, was disposed of by the court as follows: "We are not impressed with the view that the term [Indians], when used in statutes without qualification, should be construed as being restricted to a meaning less comprehensive than the ordinary significance thereof. The term 'Indians,' as ordinarily used when referring to persons in the United States, is understood to refer to the members of that race of men who inhabited North America when it was found by the Caucasian people. We do not see that it logically follows that a member of that race who has become a citizen may no longer be properly called an Indian, with more force than it would also follow that a member of the African or negro race, commonly called in this country the 'colored race,' and who is also a citizen, may not be properly and technically described by his racial designation. In the absence of plain and unequivocal words showing unmistakably that only those still sustaining tribal relations are referred to, we think, when the term 'Indians' is used in a statute, and without any other limitation, it should be held to include members of the aboriginal race, whether now sustaining tribal relations or otherwise."

Counsel for the state say a reading of the statute itself clearly indicates an intention to exempt tribal Indians only from the jurisdiction of the state courts. What is there in the statute to warrant us in importing the word "tribal" into it to give effect to the claimed meaning? There is not a word or phrase in it to indicate that the words "Indian" and "Indians" were not employed in their commonly understood sense. This being so, we cannot depart from its letter in search of some other meaning.

We come now to the objection that the offense was committed on an Indian reservation, which, together with the race of accused and deceased, is the ground of appellant's motion for a directed verdict, and to dismiss the prosecution, and which were refused by the court.

It is conceded that the town of Wadsworth is within the limits of the Pyramid Lake Indian reservation as originally constituted. The reservation was so legally constituted by the following executive order:

"Executive Mansion, March 23, 1874.

"It is hereby ordered that the tract of country known and occupied as the Pyramid Lake Indian Reservation in Nevada, as surveyed by Eugene Monroe in January, 1865, and indicated by red lines according to the courses and distances given in tabular form on accompanying diagram, be withdrawn from sale or other disposition and set apart for the use of the Pah Ute and other Indians residing thereon.

"[Signed]   U. S. Grant."

United States v. Leathers, 26 Fed. Cas. 897, 898, No. 15,581.

The Pyramid Lake Indian reservation was definitely created and the lands embraced therein withdrawn from sale by this order. In re Crosby, 38 Nev. 389, 149 P. 989.

In this connection it is contended by appellant that the state had, prior to the homicide, ceded exclusive jurisdiction over the territory included in the Pyramid

Lake Indian reservation to the federal government. This claim is predicated upon an act of the Nevada legislature of 1921 (chapter 23), sections 1 and 2 of which read:

"§ 1. The consent of the State of Nevada is hereby given, in accordance with the seventeenth clause, eighth section of the first article of the constitution of the United States, to the acquisition by the United States, by purchase, condemnation or otherwise, of any land in this state which has been, or may hereafter be, acquired for sites for customhouses, courthouses, post offices, arsenals, or other public buildings whatever, or for any other purpose of the government.

"§ 2. The exclusive jurisdiction in and over any land so acquired by the United States shall be, and the same is hereby, ceded to the United States for all purposes, except the service upon such sites of all civil and criminal process of the courts of this state, but the jurisdiction so ceded shall continue no longer than the said United States shall own such lands; *provided,* that an accurate description and plat of such lands so acquired, verified by the oath of some officer of the general government having knowledge of the facts, shall be filed with the governor of this state."

See sections 2895, 2896 N. C. L. 1929.

The foregoing act was repealed by the legislature of 1933 (1933 Stats. p. 2, c. 2), but it is contended that such repeal could not affect the jurisdiction theretofore ceded. Be that as it may, we are not in accord with the contention that it legally appears that such cession was effected by said act. Assuming, without deciding, that the Pyramid Lake Indian reservation was within the purview of the former act, appellant was unable to prove, and it does not otherwise appear, that the proviso in section 2 was complied with, which was essential to give effect to such a cession. In this connection counsel for appellant in their opening brief stated: "The map in question may or may not have been filed

with the Governor of this state. We were not able to prove the fact at the time of the trial."

■ They claim, however, that the filing of an accurate description and plat of the lands so acquired, verified by the oath of some officer of the general government having knowledge of the facts, with the governor of the state, was a mere ministerial act, the omission of which could not have affected the act of cession contemplated by the statute. We do not agree. The proviso, in our opinion, intended to be complied with to accomplish a completed cession of jurisdiction. Until such compliance the statute was a mere offer upon the part of the state to cede jurisdiction. The proviso provided the manner of acceptance. This is also the construction placed upon the statute, by Judge Norcross, in Six Cos. Inc. v. De Vinney (D. C.), 2 F. Supp. 693, 695. The court in that case said: "If the Secretary [Secretary of Interior] had authority to establish such reservation and the same was within the purview of the state statute, then, if the plat and affidavit accompanying the same complied with the provisions of the statute, jurisdiction over the area within the described boundaries vested in the United States upon filing the plat with the Governor."

And again the court said on page 696 of 2 F. Supp.: "As the act in question is general, in order to accomplish a relinquishment of jurisdiction over a particular site, the purpose of the site must be such as is within the purview of the statute; the land constituting the same must have been acquired for such purpose, and thereafter an accurate description and plat of such land so acquired, duly verified, must be filed with the Governor."

The case of Ft. Leavenworth R. Co. v. Lowe, 114 U. S. 525, 5 S. Ct. 995, 29 L. Ed. 264, in which it was held that acceptance by the general government of a state grant of jurisdiction must be presumed, in the absence of any dissent on the part of the former, is not in point.

The state statute in that case was a special statute, and evidence of acceptance was not, as in the one before us, made an essential condition of cession.

■ As was stated in Six Cos. Inc. v. De Vinney, supra, statutes relinquishing jurisdiction should be strictly construed. A controlling reason for such construction is that it is a matter of the greatest importance to both the national and state governments affected. Larson v. South Dakota, 278 U. S. 429, 49 S. Ct. 196, 73 L. Ed. 441.

Did the killing occur upon an Indian reservation? Counsel for the state contend that the Wadsworth townsite tract of land was by an act of Congress in 1924 withdrawn from the Pyramid Lake Indian reservation. This seems to be the fact. The said act is entitled: "An Act for the relief of settlers and town-site occupants of certain lands in Pyramid Lake Indian Reservation, Nevada." Approved June 7, 1924. See chapter 311, vol. 43, part 1, U. S. Statutes at Large, p. 596 (25 U. S. C. A. sec. 421 note).

Section 1 of the act provides for the sale by the secretary of the interior to settlers or their transferees of any lands in the reservation that have been settled upon, occupied, and improved by them in good faith, for a period of 21 years.

"2. That the Secretary of the Interior is also authorized to have a survey and plat made of the town of Wadsworth, in said Pyramid Lake Indian Reservation, and thereafter sell the unpatented lands embraced in the said town as provided for by section 2384 of the Revised Statutes of the United States, and on compliance with said statute the purchasers of the lots shall acquire title as provided for by the said statute: Provided, That any land within the limits of said town used for Indian school purposes or for other public use for Indians shall be, and the same are hereby, reserved from said townsite, and the Secretary of the Interior, upon payment to him of the sum of $100, is hereby

authorized to convey by patent to the board of county commissioners of Washoe County, Nevada, or other proper school officials of the town of Wadsworth, Nevada, the lands now known as lots thirty-eight to forty-seven, inclusive, of block 2 in said town of Wadsworth, as surveyed in 1898 by T. K. Stewart: Provided further, That if there are any Indians residing in said town and in possession of and claiming any lots therein they shall have the same rights of purchase under the said statute as white citizens."

(The use of the proceeds of sale is then designated.)

Section 3 confers title to lands in the reservation theretofore acquired by patents, or by certification, to the State of Nevada.

"4. All sales in accordance with section 1 of this Act shall be made through the local land office within ninety days after the price of the land shall have been fixed by the Secretary of the Interior: 'Provided, That where entry is not made within the time specified, the United States shall enter upon the premises and take possession thereof for the use and benefit of the Piute Indians of the Pyramid Lake Indian Reservation.'" Approved June 7, 1924.

By this act the Indians' title of occupancy to the lands in the Wadsworth townsite was extinguished except as to any lands that may have been included in the reservation made in said section 2. The Pyramid Lake Indian reservation was, to this extent, diminished.

The making of the survey and plat contemplated by section 2 of the act was stipulated by counsel on the introduction in evidence by appellant of a map of the townsite of Wadsworth, as will be seen by the following:

"Mr. Heward: If the Court please, we offer in evidence this map of the townsite of Wadsworth, Nevada, which appears to be the last one filed or on file or filed with and filed by the Department of the Interior, is this correct?

"Mr. Brown: May it please Your Honor, we stipulate

by counsel that this is a map of the official survey made of Wadsworth Townsite, and filed and accepted on September 1, 1931, by the Department of the Interior and surveyed by the Secretary of the Interior under and by provision of section 2 of An Act of Congress, approved June 7, 1924, being chapter 311 of the United States Statutes at Large, Vol. 43, at page 596; and that said survey was made by the Secretary of the Interior in accordance with section 2384, Revised Statutes of the United States [43 U. S. C. A. sec. 715] and that it is at the present time the official survey of the Townsite of Wadsworth, Washoe County, Nevada, the original of which is filed in the office of the Public Land Office of the United States, in Reno, Nevada.

"Mr. Heward: That is a satisfactory and accurate statement."

Our view that the act of 1924 effected a withdrawal of the townsite of Wadsworth from the reservation is strengthened by the provisions of section 4 of the act, that the United States shall enter upon the lands and take possession for the use and benefit of the Indians where entry is not made by the settlers or transferees within the time specified. If such lands were not withdrawn from the reservation by the act, the United States would never have been out of possession for such use and benefit.

The court's instruction to the jury that the said townsite, as shown by said official map, is not within the Pyramid Lake reservation, the same having been officially withdrawn from said reservation by the act of Congress approved June 7, 1924, was correct. The court did not err in refusing to grant appellant's motion to dismiss the prosecution for lack of jurisdiction. As to the motion for a directed verdict, such a motion is unknown to our criminal practice.

Our conclusion concerning the withdrawal of the town of Wadsworth from the reservation also disposes of appellant's contention that there is no proof that any of the so-called Wadsworth lots have been sold.

It is immaterial. United States v. Pelican, 232 U. S. 442, 34 S. Ct. 396, 58 L. Ed..676, 677, cited by appellant on this contention, is not in point.

In that case the killing of an Indian allottee upon lands allotted to him within part of an Indian reservation which was restored to the public domain, which allotment was excepted therefrom, was held cognizable in the federal courts under a statute which extended to the Indian country certain general laws of the United States as to the punishment of crime. The reservation was included in the Indian country. The allotment was held in trust by the government for the benefit of the allottee. It was held to be Indian country. The distinction is obvious. In the Pelican Case the allotment was excepted from the tract removed from the Indian country. In the instant case the townsite was withdrawn from the reservation.

■ Appellant's contention that his motion to dismiss the prosecution should have been granted because the proof shows that the offense was committed within the exterior lines of the reservation has no merit. Eugene Sol Louie v. United States (C. C. A.), 274 F. 47.

■■ Appellant contends that the court committed error in giving the following instruction: "The Court further instructs the jury that the burden is on the defendant accused by the state of an offense against an Indian, to show that the offense was committed on an Indian reservation, and that he, the defendant, is an Indian."

In the case of State v. Buckaroo Jack, 30 Nev. 325, 96 P. 497, it was held that the burden was on the defendant to show that the crime with which he was charged was committed on an Indian reservation. We do not understand appellant's counsel to question the correctness of this ruling, but they say the instruction which is based upon it is erroneous, in that it does not state the extent to which this burden must be sustained. It is their contention that it need not be sustained to a degree of proving said facts beyond a reasonable doubt

or by a preponderance of the evidence, but only to the extent that a duty is placed upon a defendant to go forward with evidence tending to prove the lack of jurisdiction, and if upon the whole evidence there is a reasonable doubt of guilt or of jurisdiction, the accused is entitled to the benefit of such doubt. The instruction is correct as a general proposition. State v. Buckaroo Jack, supra; Underhill's Cr. Ev. (4th ed.) p. 67 (Niblack). As appellant introduced no evidence to show that the killing occurred on an Indian reservation, it is difficult to see how he could have been harmed because the instruction did not descend to particulars in keeping with his contention.

■ Error is assigned on account of the refusal of the court to grant a trial by the court instead of requiring a trial by jury. We are not impressed with this contention. It is unique at least in its assumption that appellant was prejudiced because the court declined to permit him to waive the benefit of a jury which for centuries has been considered a traditional guarantee of Anglo - Saxon liberty. Prejudice is not discernible in such a situation. However, we are of the opinion that a jury could not have been waived in this case, and the court therefore committed no error in refusing to permit it.

We need not determine whether our state constitution prohibits the waiver of a jury trial in a felony case because such waiver is clearly inhibited by statute. In passing, however, it is to be noted that the legislatures of 1933 and 1935 (see Stats. 1933, p. 364; Stats. 1935, p. 418) adopted a joint resolution permitting waiver of trial by jury in criminal cases, which proposed amendment is to be voted upon at the coming election. Query: Did these legislatures believe that such amendment was necessary to permit such a waiver? It would seem so. This court in the case of State v. Borowsky, 11 Nev. 119, was of the opinion that on the trial of an indictment a jury cannot be waived. The court said in a unanimous opinion written by Justice BEATTY: "It seems to be

implied in the language of the constitution (art. 1, sec. 3) and expressly enacted in the law (Comp. L., secs. 1679, 1687) that on the trial of an indictment a jury cannot be waived."

The said section 1687 is the same as section 10657 N. C. L. It reads: "No person can be convicted of a public offense, tried by indictment, unless by a verdict of a jury, accepted and recorded by the court, or upon a plea of guilty, or when he refuse to plead after judgment against him upon a demurrer to the indictment."

This statute must, on this question, be considered in pari materia with section 10920 N. C. L. since enacted, which reads: "Issues of fact must be tried by jury, unless a trial by jury be waived in cases not amounting to felony, by consent of both parties expressed in open court and entered in its minutes."

Waiver in cases not amounting to a felony is thus expressly permitted, and is not the converse, that in felony cases it is prohibited, the plain implication of the statute? We think so. And when considered with the declaration in section 10657, supra, that no person can be convicted of a public offense tried by indictment, unless by a verdict of a jury, there is no escape from the conclusion that it is the legislative intent that a jury may not be waived in a criminal case of the grade of a felony prosecuted by indictment.

The same must be said of such a case prosecuted by information by reason of sections 11327 and 11332 N. C. L. which provide, respectively:

"The several courts of this state shall have and may exercise the same power and jurisdiction, to try and determine prosecutions upon information for crimes, misdemeanors and offenses, to issue writs and process and do all other acts therein as in cases of like prosecution under indictment."

"All provisions of law applying to prosecutions upon indictments, to writs and process therein, and the issuing and service thereof, to motions, pleadings, trials and punishments, or the passing or execution of any

sentence, and to all other proceedings in cases of indict-
ment, whether in a court of original or appellate juris-
diction, shall to the same extent, and in the same manner
as near as may be, apply to informations and to all
prosecutions and proceedings thereon."

The argument made and authorities cited by counsel
for appellant to the effect that a statutory right may be
waived have no application in the presence of plain
statutory prohibition.

■ Error is claimed in the action of the court in
permitting witnesses Lawrence Bianchini and Richard
H. Cowles, Jr., whose names were not indorsed on the
information, to testify in behalf of the prosecution.
The name of the former was indorsed on the informa-
tion by order of the court after he was called as a wit-
ness. It does not appear that the latter's name was
indorsed thereon at all. However, it appears that the
testimony of these witnesses was well known to appel-
lant's counsel for some time before the trial. In view
of this fact, we do not think the court abused its dis-
cretion in permitting them to testify. State v. Mona-
han, 50 Nev. 27, 249 P. 566.

We will not discuss the other errors assigned. We
have considered them all and find them to be without
merit.

The judgment and order denying appellant's motion
for a new trial should be affirmed.

It is so ordered.

TABER, J.: I concur.

COLEMAN, J., concurring:

I concur in the order of affirmance, but not in the
entire opinion. I am convinced that, if the trial court
had accepted the offer of the defendant to waive a trial
by jury, no error would have been committed. Briefly,
my views are:

So far as the federal constitution is concerned, the
point is settled by the case of Patton v. United States,

281 U. S. 276, 50 S. Ct. 253, 74 L. Ed. 854, 70 A. L. R. 263. I am of the opinion that the same conclusion is justifiable as to our state constitution and statutes. Article I, sec. 3, of our constitution, provides: "The right of trial by jury shall be secured to all, and remain inviolate forever."

Article 3, sec. 2, cl. 3, of the federal constitution, provides that: "The Trial of all Crimes, except in Cases of Impeachment, shall be by Jury."

The language of the federal constitution is substantially the same as is the provision of our state constitution. It may be contended that this court in State v. Borowsky, 11 Nev. 119, held contrary to my view. To my mind that opinion is certain as to but one thing in this connection; namely, that, where the defendant agreed to a trial by eleven jurors, he should be held to be estopped from saying that he did not have a trial by a jury. The opinion is inconsistent and unsatisfactory. If one cannot waive a jury trial, he cannot be estopped, and, if he can be estopped from saying he did not have a jury trial, he should be estopped from saying he has been prejudiced in waiving a jury trial. At any rate, it is a mere play upon words to say that our constitution, in substance, provides that a criminal trial otherwise than by a jury of twelve is no trial at all, and that a jury of twelve cannot be waived, yet sustain a conviction where there was no such trial, on the ground that the defendant was estopped. That was the Borowsky Case, supra. Such an opinion should not influence us in this case.

The supreme court of Utah, in State v. Mortensen, 26 Utah, 312, 73 P. 562, 567, 633, holds that a jury may be waived, and quotes from several authorities, among them Perteet v. People, 70 Ill. 171, as follows: "A prisoner, in a capital case, is not to be presumed to waive any of his rights; but that he may, by express consent, admit them all away, can be neither doubted nor denied. He may certainly plead guilty, and thus deprive himself of one of the most valuable rights secured to the citizen,

that of a trial by jury. If he can expressly admit away the whole case, then it follows that he can admit away a part of it, but he will not be presumed to have done so. The consent must be expressly shown."

Relative to sections 10657 and 10920 N. C. L., quoted in the opinion of the Chief Justice, I need only to say that I am of the opinion that it was not the intention of the legislature to make it mandatory that a trial by jury be had in a criminal case, but merely to safeguard such a right—a "privilege," as pointed out in Patton v. United States, supra. But this court has often held, in criminal cases, that a statutory right may be waived. State v. Collyer, 17 Nev. 275, 30 P. 891; McComb v. Fourth Judicial District Court, 36 Nev. 417, 136 P. 563; State v. Holt, 47 Nev. 233, 219 P. 557.

On Petition for Rehearing
December 4, 1936.