[No. 42420. En Banc. July 12, 1973.]

THE STATE OF WASHINGTON, *Respondent*, v. ALEXANDER J. ANTOINE *et al.*, *Appellants*.

*Ziontz, Pirtle & Morisset,* by *Mason D. Morisset,* for appellants.

*Granville Egan, Prosecuting Attorney, Slade Gorton, Attorney General,* and *Joseph L. Coniff, Jr., Assistant,* for respondent.

ROSELLINI, J.—The appellants were charged in superior court with the offenses of hunting during closed season (RCW 77.16.020) and possession of deer during closed season (RCW 77.16.030). The offenses occurred on unallotted non-Indian land in what was once the north half of the Colville Indian Reservation. By way of defense, the appellants asserted that they were not subject to the state's game protection laws, immunity from such laws having allegedly been promised them by the United States Government under the terms of an agreement signed by agents of the government and by members of their Indian tribe in 1891. The trial court held that the agreement was not intended to afford such immunity from state laws, and entered judgment and sentence, from which this appeal has been taken.

The appellant husband is an enrolled member of the Confederated Tribes of the Colville Reservation, and it is not questioned that he and his wife are beneficiaries of the agreement in question, which was executed when the Indians residing on the reservation, for a stated price, ceded their right of occupancy and use of the northern half of the reservation to the United States, owner of the fee.[1] Under

---

[1] The Colville Reservation was created by executive order on July 2, 1872. 1 Kappler 915-16.

It has been settled by repeated adjudications of this court that the fee of the lands in this country in the original occupation of the Indian tribes was from the time of the formation of this government

the terms of the agreement certain lands in the ceded portion were to be allotted to Indians then residing on the northern half. A school and a millsite and buildings were to be provided on the ceded lands.

Article 6 of the agreement stated:

It is stipulated and agreed that the lands to be allotted as aforesaid to said Indians and the improvements thereon shall not be subject, within the limitations prescribed by law, to taxation for any purpose, national, state or municipal;[2] that said Indians shall enjoy without let or hindrance the right at all times freely to use all water power and water courses belonging to or connected with the lands to be so allotted, and that the right to hunt and fish in common with all other persons on lands not allotted to said Indians shall not be taken away or in anywise abridged.

It is upon the final clause of this article that the appellants place their reliance. It is their theory that, before the northern half of the reservation was ceded under the terms of this agreement, their ancestors had the exclusive, absolute, and unrestricted right to hunt and fish upon the entire

vested in the United States. The Indian title as against the United States was merely a title and right to the perpetual occupancy of the land with the privilege of using it in such mode as they saw fit until such right of occupation had been surrendered to the government. When Indian reservations were created, either by treaty or executive order, the Indians held the land by the same character of title, to wit, the right to possess and occupy the lands for the uses and purposes designated.

*Spalding v. Chandler,* 160 U.S. 394, 402, 40 L. Ed. 469, 16 S. Ct. 360 (1896).

[2]Const. art. 26, Compact with the United States, provided that the state should impose no taxes on lands or property belonging to the United States, with the proviso:

That nothing in this ordinance shall preclude the state from taxing as other lands are taxed any lands owned or held by any Indian who has severed his tribal relations, and has obtained from the United States or from any person a title thereto by patent or other grant, save and except such lands as have been or may be granted to any Indian or Indians under any act of congress containing a provision exempting the lands thus granted from taxation, which exemption shall continue so long and to such an extent as such act of congress may prescribe.

reservation, and that it was this right which the agreement was intended to preserve. The appellants do not claim to have succeeded to the interest of an allotment Indian, but it is their assumption that this provision was intended to guarantee to all the Indians on the reservation—and not just to the allotment Indians—the right to hunt on the ceded half. The state does not dispute this interpretation.

We think a plausible argument could be made that this clause, like all the other clauses in this article, was intended to guarantee to the allotment Indians the right to hunt and fish upon the southern half of the reservation, inasmuch as they would no longer be living on the reservation proper and might have their right to hunt there questioned, if it was not clarified in the agreement. Also, since it was contemplated that the unallotted lands in the ceded portion of the reservation would be opened to settlement,[8] and it was reasonably to be foreseen that the settlers might fence their land and exclude the Indians and others from hunting thereon, the allotment Indians might have no place to hunt, outside their individual allotments, unless they could hunt upon the reservation.

However, since the state has not seen fit to adopt or argue this theory and since we also find merit in the theory which the state does advance, we do not rest our decision here upon that possible interpretation of the agreement. It is the state's position that the federal government was not authorized to curtail the state's right to exercise its police power, in this contractual agreement, and that it did not purport to do so.

The appellants, on the other hand, while acknowledging

---

[3]"By the act of July 1, 1892, c. 140, 27 Stat. 62, a specified tract or portion of the reservation—with certain exceptions—was 'vacated and restored to the public domain' and it was provided that this tract should be open to settlement and entry by the proclamation of the President and should be disposed of under the general laws applicable to the disposition of public lands in the State of Washington. The exceptions were made by Congress in order to care for the Indians residing on that portion of the reservation." *United States v. Pelican*, 232 U.S. 442, 445, 58 L. Ed. 676, 34 S. Ct. 396 (1914).

that the instrument in question is in fact a contract and that the executive branch was not authorized to make treaties with the Indians at the time the agreement was entered into,[4] nevertheless insist that the agreement should be given the full force and effect of a treaty—in other words, that it constitutes the supreme law of the land—and further maintain that the plain import of its words is that the right to hunt and fish on the ceded and unallotted lands should never be subject to state regulation.

We cannot agree with the proposition that there is no significant difference between a contract and a treaty. A treaty is defined in Black's Law Dictionary (4th rev. ed. 1968), citing *Edye v. Robertson*, 112 U.S. 580, 28 L. Ed. 798, 5 S. Ct. 247 (1884); *Ex parte Ortiz*, 100 F. 955 (C.C.D. Minn. 1900); and *Charlton v. Kelly*, 229 U.S. 447, 57 L. Ed. 1274, 33 S. Ct. 945, 46 L.R.A. (n.s.) 397 (1912), as follows:

> An agreement, league, or contract between two or more nations or sovereigns, formally signed by commissioners properly authorized, and solemnly ratified by the several sovereigns or the supreme power of each state.

A treaty must be entered into with the advice and consent of the senate and must be ratified by two-thirds of the senators present. U.S. Const. art. 2, § 2. Once ratified, a treaty becomes the supreme law of the land. U.S. Const. art. 6. A treaty which deals with a matter of national and international concern may contain provisions, binding upon the states, which the Congress, without such treaty, would have no power to enact. *Missouri v. Holland*, 252 U.S. 416, 64 L. Ed. 641, 40 S. Ct. 382, 11 A.L.R. 984 (1920). States are forbidden to enter into treaties. U.S. Const. art. 1, § 10.

A contract, on the other hand, can be enforced only against those party to it. *McIntyre v. Johnson*, 66 Wash.

---

[4] *See* Act of March 3, 1871, ch. 120, Rev. Stat. § 2079: "No Indian nation or tribe within the territory of the United States shall be acknowledged or recognized as an independent nation, tribe, or power with whom the United States may contract by treaty; but no obligation of any treaty lawfully made and ratified with any such Indian nation or tribe prior to March third, eighteen hundred and seventy-one, shall be hereby invalidated or impaired."

567, 120 P. 92 (1912). *See* 17 Am. Jur. 2d *Contracts* §§ 1, 15 (1964). A state is bound by contracts executed in its behalf by its duly authorized agents, provided the contract does not contravene the constitution and does not divest the state of its essential attributes of sovereignty or its governmental powers. 81 C.J.S. *States* §§ 112-13 (1953). 49 Am. Jur. *States, Territories, and Dependencies* § 62 (1943). But before a contract liability can be imposed upon a state, there must be a contractual obligation on its part.

The United States, as a body politic, and as an incident of its sovereignty, may enter into contracts, express or implied, appropriate to the just exercise of its constitutional powers, if not prohibited by law, even though there is no special statute authorizing the government to contract. 91 C.J.S. *United States* §§ 81-82 (1955).

There is no argument by the state that the contract between the United States and the Indians of the Confederated Tribes was made without authority. The appellants, on the other hand, do not suggest that the state was a party to the contract or that the agents of the federal government who negotiated and signed the contract were authorized to act on behalf of the state.

Did the parties nevertheless intend that the state should be considered a party to this agreement?

Looking to the terms of the agreement, we find that the promises made by the federal government, setting aside for the moment the clause relating to hunting and fishing rights, were all undertakings which it was within the power of the federal government to perform. These included the payment of a stated sum for the ceded land, the allotment of certain lands to the Indians living on the north half of the reservation, the setting aside of sites and the building and maintenance of schools and other structures on the ceded land, the guarantee of water rights on the allotted land, and the exemption from taxation of the allotted land "within the limitations prescribed by law."

The latter provision is the only one in the agreement which makes any reference to state or local government,

and the provision itself is in harmony with article 26 of the Constitution of the State of Washington. In making this promise, then, the United States did not purport to invade any reserved power of the state but merely set forth in the agreement a right which was already guaranteed under the state constitution.

Thus, nowhere in the agreement did the federal government purport to act on behalf of the State of Washington or to cede any of its jurisdiction. The state itself could not have lawfully made such a cession had it been a party to the agreement. Yet the appellants earnestly contend that the court must read into the language promising the continuation of hunting and fishing rights a promise that the State of Washington would not exercise its right, under the police power, to regulate hunting upon those ceded lands which were to become a part of the public domain.

■ It was implicitly recognized by the United States Supreme Court in *United States v. Pelican*, 232 U.S. 442, 58 L. Ed. 676, 34 S. Ct. 396 (1914), that lands within the public domain which are not subject to the exclusive jurisdiction of the federal government are subject to the jurisdiction of the state. In that case, the defendant, charged with a crime under federal law, took the position that he was not subject to federal jurisdiction because the crime was not committed on the Colville reservation but rather was committed on allotted lands located outside the diminished reservation.

In holding that the allotted lands were Indian country and therefore subject to federal jurisdiction, the Supreme Court took cognizance of the fact that Congress in the Act of July 1, 1892, ch. 140, 27 Stat. 62, vacated and restored to the public domain a certain portion of the reservation (that portion upon which the offenses charged in this action occurred), to be disposed of under the general laws applicable to the disposition of public lands in the State of Washington.[5] The court also recognized that upon the ex-

[5] *See also State ex rel. Adams v. Superior Court*, 57 Wn.2d 181, 356 P.2d 985 (1960). Another situation involving the question of federal

piration of the trust period, the allottees were, according to the terms of the act of Congress, to become subject to and to have the benefit of the laws, both civil and criminal, of the state.[6]

It is evident that Congress was aware that the ceded and unallotted lands when opened for settlement, if not before, would come under the jurisdiction of the state. In fact, the appellants do not question the state's power to regulate the taking of game on the land in question; they claim only to be exempt from the operation of the game laws by virtue of the terms of the agreement of 1891. It is their theory that the rights promised them under the agreement must include immunity from state regulation, else they were promised nothing which they would not have had without the agreement.

As stated before the appellants assert that, before the cession of the northern half of the reservation, they had the exclusive right to hunt thereon, unconstrained by state game regulations, and that it was the intent of the agree-

---

jurisdiction was before the court in *Ryan v. State,* 188 Wash. 115, 61 P.2d 1276 (1936), where we held that the federal government can secure exclusive jurisdiction over lands purchased within a state only if the state cedes such jurisdiction pursuant to article 1, section 8 of the Constitution of the United States, providing that such jurisdiction can be ceded if the land is to be used for certain enumerated purposes. Lands set aside by the federal government for Indian reservations, either through treaty or by executive order, are also under the jurisdiction of the United States by reason of the power of the federal government to regulate Indian affairs. *See* 41 Am. Jur. 2d *Indians* § 50 (1968). That power appears not to have been granted by any express provision of the constitution, but has never been denied.

[6]*See Matter of Heff,* 197 U.S. 488, 509, 49 L. Ed. 848, 25 S. Ct. 506 (1905), where the court said: "We are of the opinion that when the United States grants the privileges of citizenship to an Indian, gives to him the benefit of and requires him to be subject to the laws, both civil and criminal, of the State, it places him outside the reach of police regulations on the part of Congress; that the emancipation from Federal control thus created cannot be set aside at the instance of the Government without the consent of the individual Indian and the State, and that this emancipation from Federal control is not affected by the fact that the lands it has granted to the Indian are granted subject to a condition against alienation and encumbrance, or the further fact that it guarantees to him an interest in tribal or other property."

ment to preserve this right on the ceded land. They acknowledge that the hunting rights on the reservation were subject to federal regulation at the time of the treaty and declare that they are subject to such regulation off the reservation, although they cite no legal authority for this proposition.[7]

Counsel also conceded in oral argument that the present owners of land in the northern half of the reservation have the right to fence their land and exclude hunters. Nevertheless they maintain that state regulation of the right to hunt is an abridgment of that right, within the meaning of the language as it was used in the contract.

According to the appellants' theory, then, the party who executed the contract—the United States—has the right to abridge their hunting rights by regulating them, and its successors in interest have a right to abridge them by excluding hunters from their land; but the state, which was not a party to the agreement and authorized no promise to be made on its behalf, cannot exercise its power and duty to protect its game, because that would amount to an unauthorized abridgment.

We think that if it was contemplated that regulation of hunting rights would constitute an abridgment of those rights, the federal government would have agreed to exempt the Indians' rights from regulation. But it is not contended that it did so either expressly or impliedly. On the other hand, if it was thought that state regulation but not federal regulation would constitute an abridgment, an express provision to that effect should have been inserted, but only after the consent of the state had been sought and obtained.

---

[7] *See* 35 Am. Jur. 2d *Fish & Game* § 32 (1967), stating the general rule to be that the federal government has no power, aside from the power to enact statutes to carry out treaties respecting migratory birds (*Missouri v. Holland,* 252 U.S. 416, 64 L. Ed. 641, 40 S. Ct. 382 (1920)), to prescribe regulations for the protection of fish and game while within the boundaries of a state. In *Hunt v. United States,* 278 U.S. 96, 73 L. Ed. 200, 49 S. Ct. 38 (1928), however, it was held that the United States might exercise the proprietary right, on its own property, to kill game out of season for the purpose of protecting its game reserve.

Since the parties admittedly contemplated that the Indians' hunting rights would remain subject to regulation, it follows that regulation is not ipso facto an abridgement. We think the reasonable understanding of the parties must have been that the United States, as proprietor of the land, would not abridge the Indians' hunting and fishing rights.

Taking into account the fact that the federal government had no authority to and did not purport to act on behalf of the state or to commit it to release a portion of its sovereign powers, and the additional fact that all other provisions of the agreement were of the kind which were appropriate to such an agreement and within the power of the parties to perform, we are led to conclude that the parties intended their contract to embrace only matters which were within their control.

Whether the intent was to guarantee to the allotment Indians the right to hunt on other ceded lands as long as the white man and other Indians were allowed to hunt there, and on the southern half of the reservation with their fellow Indians—a promise which the parties could fulfill—or whether it was the intent to guarantee to all the Indians of the tribe the right to hunt upon the unallotted lands in the ceded half, we think the language "in common with all other persons" was not without significance. It was known that the government intended to open these lands to settlement, that this was its purpose in acquiring them. This meant that proprietary rights would be exercised, that the lands might be fenced and hunters excluded. Under these circumstances, it was a reasonable undertaking for the purchaser of the land to agree to see to it that, as long as it held the land and allowed others to hunt thereon, the members of the tribe also should be allowed to hunt there.

The theory that the language of this agreement was intended to preserve the hunting and fishing rights intact, just as they had existed prior to the cession of the lands, cannot be reconciled with the fact of cession of all the Indians' "rights, titles, claim and interest" in the lands and the appellants do not contend that the language was meant

to limit those words of cession. Such an interpretation would place a heavy encumbrance upon the title of every settler or purchaser.

Significantly, we find in the statutes authorizing the allotment of lands (Act of Feb. 8, 1887, ch. 119, 24 Stat. 388), appropriating money for the purchase of the Indians' rights (Act of June 21, 1906, Pub. L. No. 59-258, ch. 3504, 34 Stat. 325), and opening the unallotted land for settlement (Act of July 1, 1892, ch. 140, 27 Stat. 62), no reference to the reservation of hunting and fishing rights. Other provisions of the agreement can be found reflected in these statutes, but upon the question of hunting and fishing, the statutes are silent.

Are we to assume that, by omitting these provisions from the enabling statutes, the United States Congress intended to disregard a contractual undertaking on the part of its duly authorized commissioners? Research reveals no clue to the omission, but we assume that the government of the United States acted in good faith and that, according to its understanding of the import of the terms; they were not intended to encumber the titles of settlers and purchasers or to impose restrictions upon the exercise of the police power by the state. Rather, we assume, it was thought that the undertaking on the part of the government was that of a proprietor and that the agreement could be performed within the normal functioning of the executive department.

There is expressed in these statutes an intent that the settlers and purchasers of the unallotted lands should take the title to the land unencumbered by restrictions in favor of those who had formerly enjoyed the right to occupy and use the land. They also manifest an intent that the Indians to whom land was allotted should receive their patents in due course and become citizens of the state, subject to all of its laws and entitled to receive their benefits. It is not in harmony with this expressed intent to assume that the Congress intended at the same time to grant to those Indians and to the Indians remaining on the reservation an immunity from the state's game regulation laws, assuming

that it was within its power to grant such immunity. Such an intent cannot be found, either express or implied, in the statutes and it is not manifested in the agreement.

We are of the opinion that the trial court correctly construed the agreement of 1891, and that it was not the intent to guarantee to the Indians immunity from the laws of the state when hunting off the reservation.

█ We have no quarrel with the appellants' authorities, interpreting and giving force to Indian treaties. Such treaties are binding upon the states under the supremacy clause. U.S. Const. art. 6. As the United States Supreme Court said in *United States v. Winans,* 198 U.S. 371, 49 L. Ed. 1089, 25 S. Ct. 662 (1905), a state takes jurisdiction over its territory, when it is admitted to statehood, subject to the provisions of treaties adopted for purposes appropriate to the objects for which the United States held the territory prior to statehood. The agreement before us in this case is not a treaty and it was not signed before statehood. It is not the supreme law of the land. The statutes enacted by Congress in implementation of this agreement, which are the supreme law if they are within the power of the Congress to enact, make no reference to the provision relied upon by the appellants.

Even though it is bound by the provisions of a treaty, a state is not denied the right to enforce against the Indians its reasonable regulations for the preservation of fish. *Puyallup Tribe v. Department of Game,* 391 U.S. 392, 20 L. Ed. 2d 689, 88 S. Ct. 1725 (1968). It would be anomalous indeed if the court were to hold that the state can be deprived of its power to regulate the taking of game through the execution of a contract to which it was not a party, but could not be so deprived by the execution of a treaty admittedly within the power of the federal government to sign, which is declared by the constitution to be the supreme law of the land. We do not, however, reach the question whether this can be done by contract, since it is our conclusion that it was not intended to be done in this case.

Our view of the proper interpretation of this agreement

is in harmony with the principles which have guided the courts in deciding questions which involve an alleged conflict between the exercise of federal and state powers. The United States Supreme Court said in *South Carolina v. United States,* 199 U.S. 437, 448, 50 L. Ed. 261, 26 S. Ct. 110 (1905):

We have in this Republic a dual system of government, National and state, each operating within the same territory and upon the same persons; and yet working without collision, because their functions are different. There are certain matters over which the National Government has absolute control and no action of the State can interfere therewith, and there are others in which the State is supreme, and in respect to them the National Government is powerless. To preserve the even balance between these two governments and hold each in its separate sphere is the peculiar duty of all courts, preeminently of this—a duty oftentimes of great delicacy and difficulty.

This principle was recognized by the Supreme Court in *Dick v. United States,* 208 U.S. 340, 52 L. Ed. 520, 28 S. Ct. 399 (1908), a case strongly relied upon by the appellants. There, the defendant was prosecuted under the federal laws prohibiting the introduction of intoxicating liquor into Indian country. The violation occurred on land which had been ceded by the Nez Perce Indians to the United States. Under the terms of the agreement, the lands ceded and allotted were to remain subject to the protection of the federal laws prohibiting the introduction of liquor into the Indian country. The court upheld the agreement.

Insofar as the opinion in that case reveals, the State of Idaho was not a party to the action. It was not contended that the federal laws were in conflict with or superseded state laws; rather the defense was that the federal government did not have jurisdiction over this offense, because exclusive jurisdiction resided in the state. The court held, in the exercise of its constitutional power to regulate commerce with the Indians, the federal government might enforce an agreement of this kind for a reasonable period of time—in that case, 25 years. The court said:

In determining the extent of the power of Congress to regulate commerce with the Indian tribes, we are confronted by certain principles that are deemed fundamental in our governmental system. One is that a State, upon its admission into the Union, is thereafter upon an equal footing with every other State and has full and complete jurisdiction over all persons and things within its limits, except as it may be restrained by the provisions of the Federal Constitution or by its own constitution. Another general principle, based on the express words of the Constitution, is that Congress has power to regulate commerce with the Indian tribes, and such power is superior and paramount to the authority of any State within whose limits are Indian tribes. These fundamental principles are of equal dignity, and neither must be so enforced as to nullify or substantially impair the other. In regulating commerce with Indian tribes Congress must have regard to the general authority which the State has over all persons and things within its jurisdiction. So, the authority of the State cannot be so exerted as to impair the power of Congress to regulate commerce with the Indian tribes.

208 U.S. at 353.

Inasmuch as no conflict between the agreement and existing state law was found in that case, the court found it possible to give effect to the agreement without infringing upon the jurisdiction of the state. The case differs from this in several important aspects. In the first place the question before the court was not one of interpretation, the language of the agreement being unambiguous and the only question being, was it enforceable? The state was not a party to the action and did not claim that enforcement of the agreement would interfere with the exercise of its police power. Further, the agreement was made in the exercise of a constitutional power of the federal government—that of regulating commerce with the Indian tribes. That the hunting of game is not commerce has been long settled. *Geer v. Connecticut*, 161 U.S. 519, 40 L. Ed. 793, 16 S. Ct. 600 (1896). Another significant difference is that the duration of the agreement in that case was only 25 years, whereas here the agreement is not limited as to time. The reasonableness of the period

of time covered by the agreement as well as the absence of any conflict with state laws, were factors to which the court appears to have given substantial weight in sustaining it.

The statement of the court in *Dick* which is applicable here is that which is found in the quoted paragraph—that in performing their proper functions, each of the two governments, federal and state, must have regard to the proper functioning and jurisdiction of the other and that neither of these must be allowed to nullify the other.

It is a fundamental principle of which the court was undoubtedly aware in the *Dick* case, that the power of a state to govern men and things will not be lightly stricken down by implication, and an unexpressed purpose of Congress to set aside statutes of states regulating their internal affairs is not lightly to be inferred and ought not to be applied where the legislative command, read in the light of its history, remains ambiguous. The intention of Congress to exclude the states from exercising their reserved powers must be clearly manifested. If it is claimed that a federal act conflicts with a state act, it must be clear that the federal provisions are inconsistent with those of the state in order to justify the thwarting of state regulation. *Kelly v. Washington ex rel. Foss Co.,* 302 U.S. 1, 82 L. Ed. 3, 58 S. Ct. 87 (1937); *California v. Zook,* 336 U.S. 725, 93 L. Ed. 1005, 69 S. Ct. 841 (1949); 81 C.J.S. *States* § 7, at 886-87 (1953).

This rule applies, of course, where both the federal and state governments are acting within their proper jurisdiction and it applies to acts of Congress, the supreme law of the land. If these are the governing principles when the court is viewing laws of such dignity, they are all the more forceful where the court is asked to hold that the federal government, in a contract to which the state was not a party and to which it did not give its consent, has undertaken to bind the state to renounce one of the powers which it is bound to exercise for the common welfare.

We are convinced that our interpretation of the agree-

ment of 1891 gives full effect to the proper objectives and intentions of the parties, while preserving to the state the right to exercise its police power in an area properly within its jurisdiction.

The judgment is affirmed.

HALE, C.J., FINLEY, HAMILTON, STAFFORD, and BRACHTEN-BACH, JJ., concur.

UTTER, J. (concurring in part)—I concur in that portion of the opinion which construes article 6 to guarantee allotment Indians the right to hunt and fish upon the southern half of the reservation.

WRIGHT, J., concurs with UTTER, J.