## Case No. 10,772.

### PARROT v. LAWRENCE et al.

[2 Dill. 332.] [2]

Circuit Court, D. Kansas. 1872.

#### BRIDGE AND FERRY FRANCHISES — PRINCIPLES OF CONSTRUCTION OF LEGISLATIVE GRANTS CONFERRING EXCLUSIVE PRIVILEGES.

1. The legislature, in the charter of the Lawrence Bridge Company, gave it "the exclusive right and privilege of building and maintaining a bridge across the Kansas river at the city of Lawrence, for the period of twenty-one years," but prior to the time of the passage of such charter the legislature had given to one Baldwin the exclusive right to maintain a ferry at said city for the term of fifteen years, which franchise, at the time the bridge charter was passed, had over twelve years to run. Subsequently Baldwin ceased to operate his ferry, but the state authorities, under an act of the legislature respecting public ferries, granted a license to keep a ferry at the city of Lawrence within the limits and period covered by the bridge company's charter. *Held,* that the establishment of a ferry was not an infringement of the charter of the bridge company.

[Cited in Kansas & A. V. Ry. Co. v. Payne, 1 C. C. A. 183, 49 Fed. 118.]

[Cited in Parkersburg Gas Co. v. Parkersburg, 30 W. Va. 441, 4 S. E. 653.]

2. Principles of construction of legislative grants conferring exclusive privileges stated.

[Cited in Parkersburg Gas Co. v. Parkersburg, 30 W. Va. 441, 4 S. E. 653.]

3. The particular mode of crossing the stream employed by the defendants, and described in the opinion of the court, was held to be a ferry, and not a bridge.

This cause is now before the court on the motion of the defendants to dissolve the

---

[2] [Reported by Hon. William Cranch, Chief Judge.]

[2] [Reported by Hon. John F. Dillon, Circuit Judge, and here reprinted by permission.]

temporary injunction which was granted at chambers without resistance, restraining the defendants, the Messrs. Wilson, from operating the ferry hereinafter described. The plaintiff [E. A. Parrot], a citizen of Ohio, is one of the principal stockholders in the Lawrence Bridge Company, and, to give the court jurisdiction, states in his bill that the said bridge company and its officers have refused to proceed in the courts of the state to obtain redress for the grievances complained of by him. He makes defendants, the bridge company, the city of Lawrence, and the Messrs. Wilson, the latter of whom are operating the ferry which is the subject matter of complaint. The question on which the right to the injunction depends is whether the ferry, which will presently be described, infringes the rights of the stockholders and owners of the Lawrence Bridge Company under the charter of that company, granted by the legislative assembly of the territory of Kansas, and subsequently recognized by the legislature of the state of Kansas.

The enactments relating to the Lawrence Bridge Company so far as material, are, in substance, these: On the 15th day of February, 1857, the legislative assembly of the territory of Kansas incorporated the Lawrence Bridge Company, granting to the corporators and their assigns "the exclusive right and privilege of building and maintaining a bridge across the Kansas (or Kaw) river at the city of Lawrence for the period of twenty-one years," &c., the capital stock to be $100,000 (afterwards $375,000), to be divided into shares of $100 each—with power to the company "to establish and collect tolls for crossing the said bridge"; said bridge to be commenced within three years, &c. On the 9th of February, 1858, the legislature re-enacted the charter in the same language as that above quoted; and on the 3d day of February, 1859, amended the charter as to the rates of toll on the bridge, and on the 3d day of March, 1863, gave to the company eighteen months from that date within which to "complete said bridge in a good and substantial manner, so as to facilitate travel over the same." The bill and affidavits show that the bridge was completed according to the requirement of the legislature, and has been used, and tolls charged, ever since.

Prior to the incorporation of the Lawrence Bridge Company, the legislative assembly of the territory of Kansas had, in 1855 (St. Kan. Ter. 1855, p. 773), granted to one John Baldwin "the exclusive right to establish a public ferry within two miles of the said town of Lawrence for the term of fifteen years from and after the passage of this act"—the county authorities being empowered to fix the rates. The answer of the defendants other than the company alleges that Baldwin established and kept this ferry in the immediate vicinity of the place where the

bridge is located for some time after the erection of the bridge, when, for reasons unknown to the defendants, he ceased to operate the ferry.

By the laws of Kansas the county commissioners have the power to grant ferry licenses, and from the pleadings and affidavits, it appears that in January, 1871, one Darling obtained, from the board of county commissioners of the county in which the city of Lawrence is situated, a license to keep a ferry at the said city for the term of one year. He built a flat-bottomed ferry boat, and operated it himself under his license until April, 1871, when the city of Lawrence purchased the flat-boat and other ferry fixtures for the sum of $3,000, paying therefor out of the funds of the city; after which the Wilsons (defendants) continued to operate the ferry, they owning the engine by which the boat was moved and the city the boat. At first the arrangement between the city and the Wilsons was that the ferry should be run free, the city to compensate them for their labor and the use of their engine; and afterwards, December 4, 1871, another arrangement was made, by which the city agreed to let the Wilsons have the use of the ferry boat, ropes, and fixtures, and was to charge no tolls except five cents on each team that crossed, which is much less than the rates of toll charged by the bridge company. On the 6th day of January, 1872, the county commissioners granted to the defendant, Wilson, "the right to keep and run a ferry on the Kansas river at the city of Lawrence for one year."

According to the bill, answer, and affidavits, it appears that the ferry boat, or, as the bill styles it, the floating bridge, is operated in this way: Two ropes, or cables, are thrown across the river, fastened on each side, one of which is an endless chain. A rope is fastened to the upper side of the boat, or "floating bridge," and this rope glides upon the upper cable by means of a pulley attached to the other end of the rope, said pulley passing from side to side of the river with the boat, the motive power moving the boat back and forth across the stream being a stationary steam engine located on the north bank of the river. The boat itself is an ordinary flat-bottomed boat.

Thacher & Banks and N. T. Stephens, for complainant.

Wilson Shannon, for Messrs. Wilson and city of Lawrence.

Before DILLON, Circuit Judge, and DELAHAY, District Judge.

DILLON, Circuit Judge. The grant to the bridge company by its charter is "the exclusive right and privilege of building and maintaining a bridge across the Kansas river at the city of Lawrence," and "to establish and collect tolls for crossing said bridge." If this right has not been invaded, the complainant is not entitled to an injunction against the running of the ferry. I say the ferry, for, in my judgment, it is clear that the means used to cross the river by the defendant, Wilson—viz.: a flat-bottomed boat, connected with cables spanning the stream, and moved or propelled back and forth across it by power supplied by a stationary engine on the bank—is a ferry, as distinguished from a bridge, both under the legislation of the state and according to the usual meaning of the word.

The passage over streams is generally effected in one of two ways, viz: by bridges, which, as commonly constructed for the use of travelers and teams, are immovable structures or extentions of the highways over and across the water; and by boats, which are movable and propelled by steam-power, horse-power, the action of the current, or similar agencies. When the passage is by the latter mode it is called ferrying, which implies a boat that moves back and forth across the stream, from bank to bank. The legislation of Kansas everywhere recognizes this distinction between bridges and ferries. In the statutes of 1855 there are provisions for building bridges (chapter 18), and also for regulating ferries (chapter 71). At the first session of the legislature, in 1855, there were a great many special acts, some authorizing certain persons to build toll bridges, and others to establish and maintain ferries. Among these numerous acts was one giving to John Baldwin the exclusive right to keep a public ferry across the Kansas river at the town of Lawrence for the period of fifteen years. Two years afterwards the legislature incorporated the Lawrence Bridge Company, giving it the exclusive right to build and maintain a bridge across the river at the same place. Did this invade the franchise which had been granted to Baldwin? Clearly not, for the two grants are different; the one was to keep a ferry and collect tolls or ferriage for crossing the stream by this mode—the other was to erect and maintain a bridge, &c., "to collect tolls for crossing the same." So that during the period for which Baldwin's ferry charter was to run, there were two modes of crossing the river at Lawrence expressly authorized—the one by means of Baldwin's ferry, the other by means of the bridge of the Lawrence Bridge Company.

The contract of the legislature with the bridge company must be protected from subsequent invasion. But what was that contract? It was simply an exclusive right to build a bridge and to "collect tolls for crossing the same." It is argued that the contract with the bridge company was that the travel of a certain district, to-wit: those passing the river at Lawrence should pass over this bridge and pay tolls therefor. But it is clear that such was not the contract: 1st, because it is not so expressed, or fairly to be implied from the language used; and, 2d, be-

cause the existence of the Baldwin ferry charter, which must be presumed to have been in the mind of the legislature when it passed the bridge charter, and which, by its terms, would continue in force many years after the period fixed for the completion of the bridge, shows that the legislature did not intend to make a contract with the bridge company to the effect that all persons and property crossing at Lawrence should pass over the bridge.

When we consider that legislative grants creating monopolies, while they are not to be cut down by hostile or strained constructions, are nevertheless not to be enlarged beyond the fair meaning of the language used (Binghamton Bridge Case, 3 Wall. [70 U. S.] 74), this conclusion seems, to my mind, so clear as not to admit of fair doubt.

It has been settled by adjudication that the exclusive right to a toll bridge is not infringed by the erection of an ordinary railroad bridge within the limits over which the exclusive right extended (Mohawk Bridge Co. v. Railroad Co., 6 Paige, 564; Bridge Proprietors v. Hoboken Co., 1 Wall. [68 U. S.] 116, 150, and cases cited); and the reasoning upon which this conclusion rests shows that where the charter of the bridge company is silent upon the subject, its exclusive right would not be invaded by the establishment, under legislative authority, of a public ferry, although this would have the incidental effect to injure the value of the franchise of the bridge company. That this is the opinion of the presiding justice of this court is plain from an expression to that effect, by way of argument, in his opinion in the Hoboken Bridge Case, 1 Wall. [68 U. S.] 116, 149. In that case the legislature of New Jersey, in 1790, authorized the making of a contract with certain persons for the building of a bridge over the Hackensack river, and by the same statute enacted that it should not be lawful for any person to erect "any other bridge over or across the said river for ninety-nine years;" and it was held that the railroad bridge subsequently authorized, which was so constructed as that persons or property could not pass over it except in railway cars, did not impair the legal rights of the bridge proprietors. Mr. Justice Miller, in discussing the question as to what was the meaning of the act of 1790 and the contract with the persons who built the bridge, says: "There is no doubt that it was the intention of those who framed those two documents to confer on the persons now represented by the plaintiffs some exclusive privileges for ninety-nine years. If we can arrive at a clear and precise idea what that privilege is, we shall perhaps be enabled to decide whether the erection proposed by the defendants will infringe it. In the first place, it is not an exclusive right to transport passengers and property over the Hackensack and Passaic rivers, for there is no prohibition of ferries, nor is it pretended that they would vio-

late the contract." [Bridge Proprietors v. Hoboken Co.] 1 Wall. [68 U. S.] 149.

In conclusion I may remark, that I have considered the very ingenious argument made by the complainant's counsel to show that the mode adopted by the defendants for transporting persons and property across the river is not a ferry, but a flying bridge, or a floating bridge, and hence it is a violation of the franchise of the bridge company. But the single boat which is made to cross the river by steam-power is not, in my judgment, a bridge of any kind, and certainly not a bridge within the meaning of legislation of the state of Kansas on the subject of bridges and ferries. It is argued, and perhaps with correctness, that the city of Lawrence transcended her powers in purchasing boats and in assisting Wilson to maintain his ferry under his license from the county authorities. But if this be granted, it falls far short of showing that the complainant is entitled, in consequence, to an injunction to prevent Wilson from running his ferry under his license.

Injunction dissolved.

As to the powers of municipal corporations with respect to ferries. see Dill. Mun. Corp. §§ 31, 78, 79, and cases there cited.