## LARSON *v.* SOUTH DAKOTA.

No. 102.  Argued January 8, 1929.—Decided February 18, 1929.

430

Mr. *Wm. M. Potts,* with whom *Mr. Byron S. Payne* was on the brief, for appellant.

*Messrs. Buell F. Jones,* Attorney General of South Dakota, *Raymond L. Dillman,* and *Ray F. Drewry,* Assistant Attorneys General, were on the brief for appellee.

Mr. CHIEF JUSTICE TAFT, after stating the case, delivered the opinion of the Court.

The exclusive ferry leases were contracts between the State and the petitioner. *The Binghamton Bridge,* 3 Wall. 51. Was the building of the bridge a breach of them?

The Supreme Court of the State has had the meaning of " exclusive ferry franchise " before it twice before this case, in *Nixon* v. *Reid,* 8 S. D. 507, and in *Chamberlain Ferry & Cable Bridge* v. *King,* 41 S. D. 246; but these cases did not require consideration of the effect of the term as applied to anything but ferries. The court said on that subject in the present case:

"All that is contemplated by the statute and all that was granted by the plaintiff's leases was the right to operate a ferry together with a prohibition upon the granting boards from granting other ferry leases within the granted area during the period. . . . Nowhere in

the statute can be found or implied a provision that the State was binding itself not to construct, nor authorize the construction of, a bridge across the river within the four mile area, or not to permit carriage by aviation across it. The fair and reasonable construction of the statute is that it refers solely to transportation by ferry."

Coming from the State Supreme Court, this language is very persuasive of the meaning of the statute and would indicate that in its view the building of a bridge was not a breach of the ferry contracts.

The petitioner relies on the contract clause of the Federal Constitution, and is not prevented from invoking from this Court an independent consideration of what the contract means, and whether by a proper construction, the building of a bridge impairs its obligation. *Appleby* v. *City of New York*, 271 U. S. 364, 380; *Columbia Ry. Co.* v. *South Carolina*, 261 U. S. 236, 245; *Long Sault Development Co.* v. *Call*, 242 U. S. 272, 277; *Louisiana Ry. & Navigation Co.* v. *New Orleans*, 235 U. S. 164, 170; *Mobile and Ohio R. R. Co.* v. *Tennessee*, 153 U. S. 486, 492; *Huntington* v. *Attrill*, 146 U. S. 657, 684; *New Orleans Water Co.* v. *Louisiana Sugar Co.*, 125 U. S. 18, 38; *Wright* v. *Nagle*, 101 U. S. 791, 794; *University* v. *People*, 99 U. S. 309, 321; *Bridge Proprietors* v. *Hoboken Co.*, 1 Wall. 116, 145; *The Binghamton Bridge*, 3 Wall. 51, 81; *Jefferson Bank* v. *Skelly*, 1 Black. 436, 443.

We must therefore treat the question as an open one and determine as an independent matter what the parties must be held to have had in mind in the use of the term " exclusive lease."

The chapter of the Revised Code of the State immediately preceding that which directs the letting and granting of exclusive ferry leases provides for the building of bridges over the rivers of South Dakota. This close relation of the chapters suggests that if bridges were intended to be forbidden by the contract, the parties would have

been likely to mention a bridge as a breach. But there is no mention of a bridge in the statute or contract dealing with ferries.

On the other hand, it is argued that it was so well understood by everyone, including the parties, that the erection of a bridge in the forbidden area would destroy the value of the ferry leases, and so defeat the real object of the leases, that an implication necessarily arises that a bridge would be a breach of the leases.

Reference is made to *Newburgh Turnpike Co.* v. *Miller*, 5 Johns. Ch. 101, 111, a decision by Chancellor Kent. That was a suit to enjoin as a nuisance the construction and use of a bridge over the Wallkill River, upon which the plaintiff had a toll bridge of more than ten years' standing, and the injunction was granted.

The Chancellor said:

" It was observed in the case of *Ogden* v. *Gibbons* (4 Johns. Ch. Rep. 150, 160), and shown to be a principle of the common law, that if one had a ferry by prescription, and another erected a ferry so near it, as to draw away its custom, it was a nuisance, for which the injured party had his remedy by action. The same law and remedy were applied to the case of a fair or market, in which an individual had a freehold interest, if another fair or market was erected or used within its vicinity. The same doctrine applies to any exclusive privilege created by statute: all such privileges come within the equity and reason of the principle; no rival road, bridge, ferry, or other establishment of a similar kind, and for like purposes, can be tolerated so near to the other as materially to affect or take away its custom. It operates as a fraud upon the grant, and goes to defeat it. The consideration by which individuals are invited to expend money upon great and expensive and hazardous public works, as roads and bridges, and to become bound to keep them in constant and good repair, is the grant of a right to an exclusive toll.

This right, thus purchased for a valuable consideration, can not be taken away by direct or indirect means, devised for the purpose, both of which are equally unlawful."

It will be observed that the facts there related to two bridges, and the case is not necessarily an express authority holding that an exclusive franchise for a ferry excludes a bridge. Yet it may be strongly argued from the language used that that is what the Chancellor had in mind.

We think, however, a broader question arises in the proper construction of a public grant like this. The leading case on the subject in Federal jurisprudence is that of *Charles River Bridge* v. *Warren Bridge,* 11 Pet. 420, 547. In that case the Legislature of Massachusetts incorporated a company to build a bridge over the Charles River where a ferry stood, granting it tolls. Years after, the Legislature incorporated another company for the erection of another bridge within 800 feet of the original one. The new bridge was to become free after a few years, and at the time of the litigation it had become actually free. The Charles River Bridge was deprived of the tolls and its value was destroyed. Its proprietors filed a bill against the proprietors of the Warren Bridge, for an injunction against the use of the bridge as an act impairing the obligations of a contract and repugnant to the Constitution of the United States. The Supreme Court of Massachusetts dismissed the bill and the case was brought by error to this Court, which affirmed the judgment of the Massachusetts court. The principle of the case is that public grants are to be strictly construed, that nothing passes to the grantee by implication. The court cited *United States* v. *Arredondo,* 6 Pet. 691, 738; *Jackson* v. *Lamphire,* 3 Pet. 280, 289; *Beaty* v. *Lessee of Knowler,* 4 Pet. 152, 165; *Providence Bank* v. *Billings and Pittman,* 4 Pet. 514, 561. In the last case Chief Justice Marshall said, of an asserted limitation on the taxing power:

". . . as the whole community is interested in retaining it undiminished, that community has a right to

insist that its abandonment ought not to be presumed, in a case in which the deliberate purpose of the state to abandon it does not appear."

The case then before the court was held to be subject to the same rule, although one of a corporate grant. The act of incorporation was silent in respect to the contested power. The argument made in favor of the proprietors of the Charles River Bridge was the same as that of the Providence Bank, namely, that the power claimed by the State, if it existed, must be so used as not to destroy the value of the franchise granted to the corporation. The argument was rejected.

Chief Justice Taney, delivering the opinion in the *Charles River Bridge* case, said [p. 547]:

" But the object and end of all government is to promote the happiness and prosperity of the community by which it is established; and it can never be assumed that the government intended to diminish its power of accomplishing the end for which it was created. And in a country like ours, free, active, and enterprising, continually advancing in numbers and wealth, new channels of communication are daily found necessary, both for travel and trade, and are essential to the comfort, convenience and prosperity of the people. A state ought never to be presumed to surrender this power, because, like the taxing power, the whole community have an interest in preserving it undiminished. And when a corporation alleges that a state has surrendered for seventy years its power of improvement and public accommodation, in a great and important line of travel, along which a vast number of its citizens must daily pass, the community have a right to insist, in the language of this Court above quoted, ' that its abandonment ought not to be presumed in a case in which the deliberate purpose of the state to abandon does not appear.' "

The same principle is declared in *Fanning* v. *Gregoire,* 16 How. 524, 534; *Wright* v. *Nagle,* 101 U. S. 791, 796; *Wheeling & Belmont Bridge Co.* v. *Wheeling Bridge Co.,* 138 U. S. 287, 293, and *Williams* v. *Mingo,* 177 U. S. 601, 603. Speaking for the Court in the last case Mr. Justice Brewer said:

"A contract binding the State is only created by clear language and is not to be extended by implication beyond the terms of the statute. *Fanning* v. *Gregoire,* 16 How. 524, is in point and decisive.".

The cases above cited are not exactly on all fours with the specific issue presented here, but they serve to show with great emphasis the necessity for one who relies upon a public grant as a basis for a private right, to bring it expressly within the grant or statute.

It is clear from them that in determining the effect of a public grant to an individual the principle *ut res magis. valeat quam pereat* is not to be applied in his favor or an implication to be made enlarging his grant, as seems to have been the view of Chancellor Kent· in *Newburgh Turnpike Co.* v. *Miller, supra.*

The contention that an exclusive ferry franchise should be construed to cover all methods of travel and transportation across the water is rejected in *Dyer* v. *Tuskaloosa Bridge Co.,* 2 Porter 296 (Ala. 1835); *Piatt* v. *Covington & Cincinnati Bridge Co.,* 8 Bush 31 (Ky. 1871); *Snidow* v. *Board of Supervisors of Giles County,* 123 Va. 578 (1918); *Dibden* v. *Skirrow* [1908] 1 Ch. 41. There are many strong dicta to this same effect. *Morey* v. *Orford Bridge,* Smith (N. H. 1804) 91, 95; *Piscataqua Bridge* v. *New Hampshire Bridge,* 7 N. H. 35, 59 (1834); *Bush* v. *Peru Bridge Co.,* 3 Ind. 21, 24 (1851); *Parrot* v. *Lawrence,* Fed. Cas. No. 10772 (C. C. Kan. 1872) 18 Fed. Cas. 1234; *State ex rel. McPherson Bros.* v. *Superior Court,* 142 Wash. 284, 291 (1927).

The great weight of authority holds that a contractual term forbidding a ferry or a toll bridge does not exclude a railroad bridge. *Mohawk Bridge Co.* v. *Utica & Schenectady R. R.*, 6 Paige 554, 564 (N. Y. 1837); *McLeod* v. *Savannah, Albany & Gulf R. R.*, 25 Ga. 445 (1858); *Bridge Proprietors* v. *Hoboken Co.*, 1 Wall. 116, 149 (1863); *Hopkins* v. *Great Northern Ry.*, 2 Q. B. D. 224 (1877), overruling *Regina* v. *Cambrian Ry.*, L. R. 6 Q. B. 422 (1871). Contra: *Enfield Toll Bridge Co.* v. *Hartford & New Haven R. R.*, 17 Conn. 40, 45 (1845).

There is some conflicting authority on the main question. *Gates* v. *McDaniel*, 2 Stewart 211 (Ala. 1829); *Norris* v. *Farmers' & Teamsters' Co.*, 6 Cal. 590 (1856); *Menzel Estate Co.* v. *City of Redding*, 178 Cal. 475 (1918); *Blanchard* v. *Abraham*, 115 La. 989 (1906). But all of these cases are distinguishable in that the infringing bridge or ferry was established without legal authority, and there were other reasons such as obstruction to navigation, special statutes, or injury to tangible property which affected the decisions.

The strongest case for the appellant is *Mason* v. *Harper's Ferry Bridge Co.*, 17 W. Va. 396 (1880), where a statute forbidding other ferries was held to give an exclusive right to transportation over the river and hence to prohibit rival bridges as well, but the court said that the Legislature could take away at any time all the exclusive privileges of the proprietors theretofore existing.

In *Hopkins* v. *Great Northern Railway*, 2 Q. B. D. 224, 230 (1877), a railway company built a railway bridge and a foot bridge across a river one-half mile above an ancient ferry, which then went out of business. It was held that the ferry could not obtain compensation for either bridge, the railway being necessary for new traffic, and the foot bridge being used by those going to the railway station or by trespassers. There was a dictum by a court of dis-

tinguished English judges " that the owner of a ferry has not a grant of an exclusive right of carrying passengers and goods across the stream by any means whatever, but only a grant of an exclusive right to carry them across by means of a ferry."

We can hardly say, therefore, from the weight of authority, that an exclusive grant of a ferry franchise, without more, would prevent a legislature from granting the right to build a bridge near the ferry. Following the cases in this Court in its limited and careful construction of public grants, it is manifest that we must reach in this case the same conclusion.

The judgment of the Supreme Court of South Dakota is

*Affirmed.*