THE PEOPLE OF PUERTO RICO, Plaintiff and Appellee, *v.* ÁUREA E. FRANCESCHI DE FLEMING ET AL., Defendants and Appellants.

No. 10172. Argued December 7, 1950.—Decided May 25, 1951.

518

520

E. T. Fiddler, José G. González, Tomás I. Nido, Andrés Guillemard, Julián O. McConnie, Jr., and Fernando Fornaris, Jr., for appellants. Víctor Gutiérrez Franqui, Attorney General (Vicente Géigel Polanco, Former Attorney General, on the brief), Alejandro Romanace, Assistant Attorney General, Carlos J. Faure, and Gabriel Guerra, for appellee.

MR. JUSTICE SNYDER delivered the opinion of the Court.

On March 24, 1948 the People of Puerto Rico filed the instant suit on behalf of the Water Resources Authority to condemn the electric distribution systems of Guayanilla and Yauco owned by the defendants. The People estimated that the fair and reasonable value thereof was $38,000 and deposited this sum. In their answer the defendants claimed that the condemned property was worth $200,000. After a trial on the merits, the Court of Eminent Domain entered a judgment awarding the defendants $279.19 in addition to the deposit of $38,000. The defendants appealed from this judgment.

The first assignment is that the lower court erred in holding that the only method to be used in valuing the condemned property was that established in § 13 of the franchise pursuant to which the distribution systems were constructed and operated.

The franchise was granted in 1920 by the Public Service Commission to Alejandro Franceschi, predecessor in interest of the defendants. Section 13 provided that the plants and systems to be constructed and used thereunder could be taken or acquired by the People and established the method of valuation in the event of such taking. In 1924, prior to completion of the distribution systems, the Commission amended the franchise. It made no substantial change, so far as this case is concerned, in the first paragraph of § 13. However, it added a second paragraph which provided for arbitration of the issue of valuation.[1]

The question is whether in filing this condemnation suit the People were endeavoring to enforce the terms of § 13. We begin by disposing of two preliminary contentions of the defendants. The first is that the Court of Eminent Domain had no "jurisdiction" to enforce the contract embodied in § 13. The defendants argue that the said Court is a court of limited jurisdiction; that it may hear only those cases where value is established pursuant to the general Eminent

---

[1] Section 13, as amended in 1924, reads as follows:

"That the plant and systems hereby authorized, and all appurtenances thereto, and all property constructed, acquired, or used hereunder, or any portion thereof, may be taken, purchased or acquired by The People of Porto Rico or the Municipalities of Guayanilla and Yauco, or either of these municipalities, at any time during the term of this franchise, at their fair and reasonable valuation at the time of said acquisition. The said valuation shall not include the value of this franchise or any added value which the said franchise may have given to the said plant or property and shall not exceed the cost of such plant and property or any portion thereof used and useful, less deterioration.

"The People of Porto Rico or the Municipalities of Guayanilla and Yauco, or either of these municipalities, shall cause sixty days' notice to be given to the grantee of its intention to exercise the aforesaid right to acquire the said properties. The fair and reasonable valuation shall be fixed by a board of arbitration, which shall be appointed forthwith and which shall be composed of one member named by the grantee, one member chosen by the Governor on behalf of The People of Porto Rico or the Municipalities of Guayanilla and Yauco, or either of these municipalities, and a third member selected by the first two. The valuation fixed by a majority of this board shall be final. The expenses of the appraisal proceedings shall be borne equally by the grantee and by The People of Porto Rico or the Municipalities of Guayanilla and Yauco, or either

Domain Act; [2] and that if value were to be fixed pursuant to § 13, the People would be required to sue not in the Court of Eminent Domain but in the courts of general jurisdiction for specific performance of the contract between the parties.

The fallacy in the theory of the defendants is that we find nothing in Act No. 223, Laws of Puerto Rico, 1948, creating the Court of Eminent Domain, which restricts the jurisdiction of the Court to those cases where value is determined pursuant to the standard fixed in the Eminent Domain Act. On the contrary, § 3 gives the Court of Eminent Domain exclusive jurisdiction "in cases of condemnation of property for public purposes". This means jurisdiction in all condemnation cases, irrespective of the test used to determine value.

Our conclusion is reinforced by the fact that value is not the only issue in a condemnation proceeding. Of course it is usually the most important issue in such a suit. But title and possession are also issues which are determined

---

of these municipalities. Nothing herein contained shall obligate The People of Porto Rico or the Municipalities of Guayanilla and Yauco, or either of these municipalities to purchase the aforesaid property, but if The People of Porto Rico or the municipalities of Guayanilla and Yauco, or either of these municipalities shall elect to purchase the same, it shall make such election by an act of the Legislative Assembly of Porto Rico or of the municipal assemblies of Guayanilla and Yauco, or either of these municipalities, duly approved as provided by law. If The People of Porto Rico or the Municipalities of Guayanilla and Yauco, or either of these municipalities shall so elect to purchase, the grantee shall retain possession of said property, maintain the same in good condition and operate the same as herein set forth and be entitled to receive the profits arising therefrom until the purchase price, fixed as aforesaid, shall have been paid, after which the same shall be disconnected from the grantee's electric plant. At any time after two years from the date of the exercise of its right to have the property valued, as above provided, The People of Porto Rico, or the Municipality of Guayanilla and Yauco, or either of these municipalities may again exercise such right, as well as have a corresponding option to purchase under the same conditions as above set forth, and so on successively."

Section 14 defines the grantee as including his heirs and successors in interest.

[2] See Act No. 300, Laws of Puerto Rico, 1946; Act No. 19, Laws of Puerto Rico, Second and Third Special Sessions, 1942; Act No. 479, Laws of Puerto Rico, 1946.

therein.[3] We find nothing in Act No. 223 which prevents the People of Puerto Rico from utilizing the device of a condemnation suit in the Court of Eminent Domain to obtain a prompt and valid title to property even where the value of the property is to be determined not under the general rule laid down in the Eminent Domain Act but pursuant to a contract between the People and the owner of the condemned property. *Muschany* v. *United States*, 324 U. S. 49; *Danforth* v. *United States*, 308 U. S. 271; *United States* v. *Two Acres of Land, etc.*, 144 F. 2d 207 (C. A. 7, 1944); *Judson* v. *United States*, 120 F. 637 (C. A. 2, 1903). See *Housing Authority of P. R.* v. *Sagastivelza et al., ante*, p. 224; *Belaval* v. *Court of Eminent Domain*, 71 P.R.R. 246.

■ Nor does the Court of Eminent Domain lack jurisdiction because the franchise not only establishes a formula to determine value but also provides for a board of arbitrators whose decision shall be final. We see no reason why the People could not have filed a condemnation suit in the Court of Eminent Domain, in order to obtain title forthwith to the properties herein, and at the same time have moved for arbitration as to value. Under those circumstances, the Court of Eminent Domain would have been required, on the issue of value, to enforce the arbitration provision of the franchise in the same way as the ordinary courts enforce arbitration awards. See *Labor Relations Board* v. *N. Y. & P.R.S.S. Co.*, 69 P.R.R. 730; *Judson* v. *United States, supra.*

■ The second preliminary contention of the defendants is that § 13 of the franchise did not provide for condemnation as one of the methods of acquisition; that as a consequence when the government filed this condemnation suit,

---

[3] In the cases where a declaration of taking is filed, the latter rather than the order of court vests title in the People. *People* v. *Registrar*, 70 P.R.R. 243; *P. R. Tel. Co.* v. *P. R. Communications Auth. et al.*, 189 F. 2d 39, (C. A. 1, May 8, 1951). But the People obtain title by virtue of the condemnation proceeding. Indeed, in many cases, even where the parties have agreed as to price, a friendly condemnation suit is filed to give the People immediate possession and a clear title.

it elected not to claim its rights under § 13; and that the lower court should therefore have determined value under the standard established in the Eminent Domain Act and not under § 13.

We disagree with the appellants on this point because we cannot accept their premise that § 13 does not provide for condemnation as one of the methods of acquisition. We think that as used in the first paragraph of § 13 the clause "may be taken, purchased or acquired" is sufficiently broad to include taking by condemnation. We concede that the matter would have been clearer if § 13 had provided that the government may "condemn, purchase or acquire". But "take" is a generic word; property may be taken by a number of methods, including condemnation. Indeed, the very document which usually vests title in the government in a condemnation case is called a "Declaration of Taking". We find nothing in the first paragraph of § 13 which prevents the government from exercising its rights thereunder by means of a condemnation suit.

It is true that, in adding the second paragraph in the 1924 amendment of the franchise, the Public Service Commission used only the words "acquire" and "purchase" in providing for valuation by a board of arbitrators. However, in adding this paragraph, the Commission did not change the phraseology of the first paragraph to the effect that the systems "may be taken, purchased or acquired" by the People. It therefore did not intend to eliminate condemnation as one of the methods of acquisition originally provided in the 1920 franchise. We hold that, reading paragraphs 1 and 2 together, the franchise does not preclude condemnation as one of the methods of acquiring these properties pursuant to § 13.

However, on the fundamental point that the People chose not to exercise their rights under the franchise, we are in agreement with the defendants. The terms of the franchise constituted a contract between the People on one

side and the grantee and his successors in interest on the other side. *N. Y. Electric Lines* v. *Empire City Subway*, 235 U. S. 179; *White Star Bus Line* v. *People of Puerto Rico*, 75 F. 2d 889 (C. A. 1, 1935); *In The Matter of Hermínia Colón de Semidey*, 59 P.R.R. 247; *Larson* v. *South Dakota*, 278 U. S. 429; *Arkansas-Missouri Power Co.* v. *Brown*, 4 S. W. 2d 15 (Ark., 1928). If the People had elected to take the distribution systems under § 13 of the franchise, all the terms of §13—the contract between the parties—would be operative, not merely the provision for valuation. These other terms are (1) 60 days' notice of intention to acquire the properties; (2) arbitration by a board of valuation, which shall be final; (3) right of the grantee to retain possession of the properties until the board fixes the price and the latter is paid.

The People could have condemned under the ordinary rule for fair and reasonable value. Or it could have condemned with the franchise fixing the measure of compensation. But to proceed under the latter it was required to comply with the three conditions just noted. We put to one side the question of 60 days' notice. But there is no dispute that the People made no move for the selection of arbitrators. And they prayed in their suit for possession on a date fixed by the court and obtained it on April 1, 1948, a week after the suit was filed. It therefore seems clear that on the question of valuation they intended to proceed not under the contract but under the Eminent Domain Act. To hold otherwise would be to permit the People to choose to enforce one part of a contract and to ignore the other provisions thereof. *Cf. Mercedes Bus Line Inc.* v. *Rojas*, 70 P.R.R. 513, 517.[4]

[4] There is nothing in the complaint contrary to the position we have taken. It is true that, after making the regular allegations found in the ordinary condemnation suit, the complaint alleges the existence of the franchise and summarizes the provisions of § 13. But it does not state that the People are taking pursuant to § 13. Nor does it pray for the appointment of arbitrators. We therefore interpret the recital of the provisions of § 13 in the complaint as an effort by the People

In view of the foregoing, the lower court erred in using the formula found in § 13 as the exclusive method of valuation. But the problem still remains as to the effect of the franchise on the market value of the condemned property.

█ Both parties agree that if § 13 were not in the franchise, the best evidence of the fair and reasonable value of a public utility, in the absence of contemporaneous sales of similar property, would be reproduction cost less depreciation. *Appleton Waterworks Co.* v. *Railroad Commission*, 142 N. W. 476 (Wisc., 1913); *Kennebec Water Dist.* v. *City of Waterville*, 54 A. 6 (Me., 1902); Annotation, 47 L.R.A. (N. S.) 770; Orgel, Valuation Under Eminent Domain, p. 642 *et seq. Cf. United States* v. *Brooklyn Union Gas Co.*, 168 F. 2d 391 (C. A. 2, 1948).

██ In the same way, if § 13 did not exist, in determining fair and reasonable compensation in this case we would take into consideration the going concern value of the systems. The latter is "the difference between the value of an established plant with its earning power already developed, and the value of an otherwise identical new plant which still has to build up its business." II Bonbright, Valuation of Property, pp. 1146–51, and authorities cited; *Kimball Laundry Co.* v. *U. S.*, 338 U. S. 1, 12; Note, 48 L.R.A. (N. S.) 1092; *Omaha* v. *Omaha Water Co.*, 218 U. S. 180, 202–03; *National Waterworks Co.* v. *Kansas City*, 62 F. 853 (C. A. 8, 1894); *Des Moines Gas Co.* v. *Des Moines*, 238 U. S. 153, 164–65; Orgel, *supra*, p. 680 *et seq.*; 34 Col. L. Rev. 534, 543, 545–47. In the *Omaha* case the Supreme Court apparently held that going concern value is a separate

---

to show that the market price a willing buyer would pay for the systems was affected by the terms of the franchise. As thus interpreted, the complaint is in accordance with the position hereinafter taken by us on the question of value of the condemned property.

Moreover, throughout the trial the People made no effort to obtain the appointment of the board of arbitrators or to defer possession by it until the board had made its decision as to price and the latter had been fully paid.

element of value in addition to the full value of the tangible property. More recently, the Supreme Court has intimated that going concern value is reflected in the fair valuation of the tangible property. *Power Comm'n* v. *Hope Gas Co.*, 320 U. S. 591, 609; Bruton, How To Value Dealer—Distributor Franchises, 29 Taxes 109, 114 (Feb., 1951). In final analysis, whether it is characterized as a "separate element" of value or whether it is considered as enhancing the value of the tangible property, going concern value is admissible in evidence in determining fair and reasonable compensation for the condemnation of a public utility system.[5]

For reasons to be hereinafter noted, we need not examine in detail the manner of proving going concern value. Concededly, it is intangible and cannot be reduced to certainty. But we cannot agree, at least in condemnation cases of public utility systems, that "going value is on its deathbed." [6]

█ Even if § 13 were not in the franchise, the defendants would not be entitled to have the alleged value of the franchise and good will taken into consideration. Where as here a franchise as a matter of law is revocable at the will of the government, *Commission* v. *Havemeyer*, 296 U. S. 506 it is not included in the valuation of the property of a public utility. *Georgia Ry* v. *R.R. Comm.*, 262 U. S. 625, 632; II Bonbright, *supra*, pp. 1143–45; Bruton, *supra*, p. 116.

---

[5] Some of the foregoing cases are rate cases and not condemnation cases. The rate cases, in seeking to determine valuation of properties as a rate base, have their roots in condemnation cases. II Bonbright, *supra*, p. 1094 *et seq.* We recognize the many defects in drawing an analogy between rate and condemnation cases. I Bonbright, *supra*, p. 3; II, *id.*, p. 1096; *Compañía Azucarera del Toa* v. *Public Service Commission*, 71 P.R.R. 197, 200, and authorities cited in footnote 2. Nevertheless, we think the same principle controls in both types of cases on the specific question of going concern value.

[6] II Bonbright, *supra*, p. 1150, points out that several writers have expressed "the view that going value is on its deathbed. And doubtless this conclusion is justified if the Supreme Court continues to insist that its amount shall be definitely 'proved' while declining to give it any meaning that makes its proof even theoretically possible. One might as well demand proof of the number of angels that can dance on the point of a needle."

528

And the same rule applies with reference to good will of a condemned public utility. *Willcox* v. *Consolidated Gas Co.*, 212 U. S. 19; *Des Moines Gas Co.* v. *Des Moines, supra*; II Bonbright, *supra*, p. 1146; Brutòn, *supra*, p. 110 *et seq.* The defendants concede these points and make no claim based on the value of their franchise or their good will.

We thus see that were it not for § 13 of the franchise the defendants would be entitled to reproduction cost less depreciation, with going concern value as an element of value.[7] But reproduction cost is used in the ordinary public utility case only because it is the best evidence available on the issue of market value. The decisive factor as in other cases is market value; *i.e.*, what a willing buyer would pay a willing seller. *Housing Authority of P. R.* v. *Valldejulli*, 71 P.R.R. 600, and cases cited; I Bonbright, *supra*, pp. 432, 447. Moreover, in determining market value the test is "what has the owner lost, not what has the taker gained." *Boston Chamber of Commerce* v. *Boston*, 217 U. S. 189, 195.

In seeking to establish market value in this case, we cannot as in the ordinary case involving condemnation of a public utility use reproduction cost as the best evidence of market value. Here, prior to condemnation by the government, a willing buyer would not have paid the defendants the reproduction cost. On the contrary, his decision as to purchase price would have been greatly influenced by the possibility that at any time after he purchased the properties the government under § 13 could take them, not at market value, but at the original cost less deterioration.[8] Under the circumstances, the defendants were entitled to introduce testimony as to reproduction cost in order first to establish the market value of the systems without refer-

---

[7] When we use the phrase "reproduction cost" hereinafter, it should be understood to include the concepts that depreciation is deducted and going concern value is added.

[8] We decide hereinafter that § 13 provides for acquisition at original cost less deterioration.

ence to § 13.[9] But if this figure were substantially higher than the original cost less deterioration, the true market value would necessarily be lower than reproduction cost because of the substantial risk that the government might forthwith recapture the systems from the purchaser at original cost less deterioration. See *Monongahela. Navigat'n. Co.* v. *United States*, 148 U. S. 312, 344.[10]

If this were a profitable enterprise, a willing buyer under the foregoing circumstances would pay more than the original cost less deterioration. How much more he would pay depends on the estimate a reasonable person would make on whether the government would recapture the systems, and when that was likely to occur. We recognize the difficulties involved in applying this test. But we see no escape from the task. At best it calls for an informed guess based on all the surrounding circumstances, including the legislative and administrative events which reflect the policy of the insular government to acquire this and the other electric distribution systems in Puerto Rico. See, among others, Act No. 189, Laws of Puerto Rico, 1946. While this will inevitably be a general figure rather than a specific sum which can be established as a mathematical certainty, the defendants are nevertheless entitled to recover it.

▮ The second assignment relates to the interpretation of the first paragraph of § 13 of the franchise. The defendants contend that the lower court erred in concluding that the formula for value established in § 13 was original cost less deterioration. Even though this formula is not the

---

[9] The record contains considerable evidence as to reproduction cost submitted by both parties because the lower court took testimony on this question for several days before it decided that original cost was the exclusive measure of compensation.

[10] In that case the court pointed out in a similar situation that (p. 344) ". . . doubtless the existence of this reserved right to take the property upon certain specified terms may often, and perhaps in the present case, materially affect the question of value." To the same effect, Orgel, *supra*, p. 672, that "the probable purchaser will take account of the probable award in purchase or condemnation."

exclusive test of value, as already noted it plays a large role in this case. It is therefore necessary to determine its meaning and scope.

The defendants place considerable emphasis on the provision in the first sentence of § 13 that the People may acquire these properties "at their fair and reasonable valuation at the time of said acquisition." They argue that this necessarily means reproduction cost in the absence of recent sales of comparable property. Consistently with this view, the defendants interpret "the cost of such plant" in the second sentence as cost of reproduction.

We cannot agree. When both sentences are read together, we think it is obvious what the Commission had in mind. It envisioned the possibility that the People might acquire the systems in a declining market, such as prevailed for several years beginning in 1929. It therefore provided for acquisition of the properties "at their fair and reasonable valuation at the time of said acquisition" in order to make certain that the People would pay only that amount if at the time of acquisition the market value or reproduction cost was less than original or actual cost because of a depression or any other reason. But to forestall the possibility that the People would have to pay more than actual cost if it acquired the systems during a period of inflation, the franchise provided that the valuation "shall not exceed the cost of such plant and property . . . less deterioration."

To agree with the defendants as to the meaning of § 13 would be to hold that § 13 was superfluous. The People could condemn the properties at reproduction cost without § 13. The Commission must have inserted § 13 in the franchise for some purpose other than to restate the general rule which applies in condemnation cases. The only purpose we can gather from it is the construction already noted.

Apart from the foregoing, we think the language plainly means original cost. Cost, when used in the ordinary sense, normally means what something actually cost, not what it

would cost at some future date if you desired to replace it. And as pointed out in I Bonbright, *supra*, p. 140, original cost is the only actual cost; reproduction cost is always hypothetical. Moreover, to agree with the defendants ·would be in effect to say that the People must pay cost *plus* appreciation. But § 13 requires payment of cost *less* deterioration.

The defendants raise the point that we are faced with two original costs: (1) the actual costs of the original grantee, and (2) the cost to the defendants, who acquired the systems by inheritance in 1933.[11] But cost does not mean what some intermediate purchaser paid for the systems. Rather it means the sums which were actually expended in construction, whether by the grantee or by his successor in interest. This would of course include any sums spent for improvement or expansion, although not for mere replacement.

The third assignment is that the lower court erred in adopting Report Z, Exhibit 8 of the plaintiff, as a basis for fixing compensation. In its findings of fact, after pointing out that it had previously ruled that the only measure of value was original cost less deterioration as provided in § 13 of the franchise, the lower court stated that it would enter judgment on the basis of Exhibit 8, which it characterized as "an estimate of the original cost of the properties of the defendants based on the cost of materials and labor in 1945." It found, following the figures in Exhibit 8, that the plant cost $62,320.35. From this it deducted not deterioration but depreciation which it held "ought to be, in the light of all the evidence presented in this case, 45 per cent and not 48 per cent plus as estimated by the plaintiff." It also stated that it had considered that the defendants had paid excise taxes on some of the materials

---

[11] The defendants offered testimony that one of the defendants, Mrs. Franceschi de Fleming, took these systems in 1933 at a value of $60,000 in lieu of her inheritance rights in the estate of her mother.

and equipment. It thereupon awarded the defendants $279.19 in addition to the deopsit of $38,000.

Section 6 of the franchise provided as follows:

"That the grantee shall keep such accounts as will at all times fully reflect the true and financial condition of the electric plant and systems hereby authorized and the results secured from its operation. All expenses incurred by the grantee in connection with the construction, installation, maintenance and operation of the said electric plant and systems, including unit costs of material and labor, as well as all income derived from the sale of electric energy, or otherwise, in connection with the said plant and systems shall be shown in proper representative accounts.

"A report giving detailed operating statistics and a duly itemized profit-and-loss account of the said plant and systems, for each fiscal year, shall be prepared by the grantee within two months after the close of each fiscal year, and be promptly filed with the Public Service Commission."

Despite this mandatory provision, the defendants kept no records of the amounts and dates of their purchases and installations of materials and equipment. This violation of the franchise was particularly flagrant in view of the possibility that the People might recapture the systems at cost under § 13. We certainly cannot discard the formula of original cost merely because the defendants violated their duty to keep records. They have only themselves to blame because the case must be decided on the basis of estimates rather than the figures of actual costs.

In the light of these circumstances, we find the position of the defendants untenable. They submitted no evidence whatsoever as to original cost because no records thereof existed. But under these conditions it was their duty to submit the best estimate they could make of original cost. This was a difficult but not impossible task. By observation at the time of taking—or perhaps even today—experts could estimate the probable dates of installation of the equipment, provided operations were normal. And prices, including

excise taxes, to small purchasers as of the dates of installation could be obtained from dealers or manufacturers. Costs of installation on the dates involved should be available to both parties, since they have both been in this business for many years. We recognize that all this will entail considerable effort. But the defendants can scarcely complain of a situation created by their failure to keep records as required by § 6 of the franchise to meet precisely this contingency.[12]

 On the other hand, what we have said makes it apparent that the lower court erred in basing its judgment solely on Exhibit 8 of the People. That was not an accurate estimate of the original cost of the condemned property for three reasons: (1) cost means cost as of the date of acquisition, not 1945;[13] (2) cost to the Water Resources Authority, which frequently bought in large amounts, might be lower than cost to the defendants, who purchased in small lots; (3) the Authority did not pay excise taxes when purchases were consigned directly to it, whereas the defendants always paid excise taxes as part of their costs.[14]

We appreciate the dilemma of the lower court. The refusal of the defendants to submit any evidence as to original cost required it to decide the case as best it could on the evidence submitted by the People on this issue. However, since a new trial will be required because of the erroneous ruling that original cost is the sole measure of compensa-

---

[12] We note in passing that § 11 of the franchise provides that the Commission shall have the right to revoke the franchise and that such revocation shall impose no obligation on the People for damages. More important, § 11 also provides that if the grantee fails to comply with *any* of the provisions of the franchise, the rights granted by the same shall *ipso facto* be forfeited and become null and void.

[13] It is not entirely clear whether the prices used in Exhibit 8 were from 1933 to 1941 or for 1945. In any event, the use of either period was improper.

[14] As noted above, the lower court made a general statement in its findings of fact that it had considered that the defendants had paid excise taxes on some of the materials and equipment. However, the case calls for more precise findings as to these taxes, which probably were generally included as part of the purchase prices paid by the defendants. See *Porto Rico Telephone Co. v. Tax Court*, 68 P.R.R. 144, 154.

tion, we think it appropriate to point out the defects in Exhibit 8. Both parties should be required to reconstruct as best they can the figures for cost as of the dates of installation.

The lower court should also re-examine its decision to allow 45 per cent for depreciation. The testimony of the People was that depreciation amounted approximately to 48 per cent; the defendants' testimony was that it amounted to 30 per cent. But both these figures were apparently submitted on the conventional theory of reproduction cost less depreciation. And depreciation under those circumstances usually includes obsolescence as well as physical deterioration. Orgel, *supra*, p. 649 *et seq.*[15] However, § 13 makes no provision for deductions for obsolescence. It provides only for deductions for deterioration. And we interpret deterioration in this context to mean physical deterioration. In calculating cost less deterioration under § 13, the lower court must therefore confine the deductions from original cost to physical deterioration.

The fourth assignment is that the lower court erred in refusing to grant compensation for the going concern value of the condemned property. We have already seen that, were it not for § 13 of the franchise, evidence of going concern value would be relevant on the issue of fair and reasonable compensation. But we have held that the measure of compensation in this case is the sum fixed by the formula found in § 13 plus whatever additional amount a willing buyer would have paid in 1948 prior to the taking. The question therefore is reduced to determining if going concern value is an element of the formula embodied in § 13.

In *Omaha v. Omaha Water Co.*, *supra*, a public utility was purchased by a Municipality under an ordinance which provided that if the property is thus acquired, nothing shall

---

[15] The testimony is not entirely clear as to whether obsolescence played any role in the figures for depreciation submitted by the experts. This should be clarified at the new trial.

be paid for the franchise. The Supreme Court held that this provision did not preclude the inclusion of going concern value as an element of value. The People seek to distinguish this case on the ground that § 13 not only provides that the "valuation shall not include the value of this franchise," but also states that there shall not be included "any added value which the said franchise may have given to the said plant . . ." The People argue that here going concern value comes under the added value flowing from the franchise for which no compensation may be granted. We do not agree. The franchise merely authorizes operation; the going concern value stems from actual operations. The latter therefore is not an added value which the franchise gave the systems.

However, we conclude for a different reason that going concern value may not be included under § 13. The latter provides that valuation thereunder "shall not exceed" cost less deterioration. Consequently, even though going concern value is a concept separate and apart from the value of the franchise, it cannot be added to cost in determining the valuation under § 13. To do so would violate the inhibition of § 13 against exceeding cost.

▇▇ The fifth assignment is that the lower court erred in weighing the evidence. We need not examine this error as the case will have to be retried in accordance with the views expressed herein. Summarizing those views, we do not think the lower court erred in admitting evidence of reproduction cost, including going concern value, less depreciation. These figures would show the market value of the systems without reference to § 13 of the franchise. But here that valuation would be useful only as a relevant factor in determining what a willing buyer would pay in the light of § 13. Such a buyer would pay only original cost less physical deterioration (excluding going concern value) plus an additional amount calculated on the basis of the period he was likely to remain in possession.

The judgment of the Court of Eminent Domain will be reversed and the case remanded for a new trial.

Mr. Justice Negrón Fernández took no part in the decision of this case.